IN THE SUPREME COURT OF MISSISSIPPI
NO. 2013-CA-01177-SCT

*SCOTT M. FAVRE; JEFFERSON PARKER; CINDY
FAVRE; CONSTANCE PARKER; AND HANCOCK
COUNTY, MISSISSIPPI*

*v.*

*JOURDAN RIVER ESTATES AND JOURDAN RIVER
YACHT CLUB, LLC*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/29/2013 |
| TRIAL JUDGE: | HON. JENNIFER T. SCHLOEGEL |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | ROBERT B. WIYGUL |
| | PATRICK W. KIRBY |
| | HEATHER LYNN LADNER |
| | RONALD J. ARTIGUES, JR. |
| | GARY MCKAY YARBOROUGH, JR. |
| ATTORNEYS FOR APPELLEES: | GEORGE W. HEALY, IV |
| | REED S. BENNETT |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | AFFIRMED - 10/09/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COLEMAN, JUSTICE, FOR THE COURT:**

¶1.     The instant matter is before the Court on appeal filed by Scott Favre, Cindy Favre, Constance Parker, Jefferson Parker, and Hancock County, Mississippi, against Jourdan River Estates, LLC. In its Final Judgment, the Chancery Court of Hancock County determined that Jourdan River Estates held a private 947-foot right-of-way starting about 400 feet north of the Heitzmann gate leading up to their tract, and it shared a public 340-foot right-of-way with the Favres, the Parkers, and Hancock County. The trial court also entered an injunction

against the Favres and Parkers forbidding them from erecting any gates which would impede Jourdan River Estates and from further harassment. Finding the trial court's judgment to be well reasoned, the Court affirms its decision.

**FACTS AND PROCEDURAL HISTORY**

¶2. The instant case follows a complex factual and procedural history, which revolves around the rights of the various parties as to Nicola Road, a road that allows the various property owners access to Highway 603. Plaintiffs Jourdan River Estates, LLC, and Jourdan River Resort and Yacht Club, LLC (together, "JRE") are the owners of a 269-acre tract of land in a rural area in Hancock County, Mississippi. Nicola Road, the subject of the current dispute, leads from Highway 603 to the JRE tract, also known as the Mentel parcel, passing by and providing access to three parcels. One parcel, owned by Cindy Favre, lies to the west of Nicola Road and is referred to as either the Heitzmann parcel (after its previous owner) or the Favre parcel. Another parcel, to the northeast, is owned by Jeff and Connie Parker and generally is referred to as the Parker North parcel. A third parcel, also owned by the Parkers, lies just to the south of the Parker North parcel, and is appropriately called the Parker South parcel. All of the parcels except Parker South were conveyed from Cinque Bambini, an ancestor in title, sometime in 1986. The following graphic accurately shows the various parcels:



In 2007, JRE proposed the construction of 1,000 condominium units and a 130-slip marina on its land along the Jourdan River. The county later approved a lesser plan of 472 condominiums. However, two owners of the adjacent tracts, Scott and Cindy Favre on the west and Jefferson and Constance Parker on the east, were strongly opposed to the construction. Together, the landowners filed a lawsuit to halt the development, but the suit was unsuccessful. *See Favre v. Hancock County Bd. of Supervisors*, 52 So. 3d 463 (Miss. Ct. App. 2011). Over the course of the first lawsuit, the dispute between JRE and the landowners escalated, resulting in JRE's request in the instant case for declaratory judgment about which portions of Nicola Road are public as well as the easement rights as to the road. JRE also requested an injunction against the landowners, requiring them to forever remove

the gate blocking access to Nicola Road.

¶3.    The instant debate over who has the rights to the various portions of Nicola Road first originates from the 1986 and 1989 conveyances from Cinque Bambini to the ancestors-in-title of the JRE tract, the Favre parcel, and the Parker North parcel.  In order to provide each newly created tract with access to the highway, Cinque Bambini created an easement that begins at the northern end of Nicola Road and runs about 1,200 feet north to the JRE tract. JRE claims that approximately the first 340 feet of the easement is a "joint right-of-way" shared by JRE, the Favres, and the Parkers, but the last 947 feet is an "exclusive right-of-way" for the sole use of JRE.  The two Nicola Road rights-of-way are described in the deeds and in subsequent surveys as sixty-foot-wide rights-of-way.  JRE notes that Cinque Bambini never conveyed the servient estate (*i.e.*, the right-of-way) in any of the deeds creating the parcels; therefore, none of the current owners owns the 340-foot right-of-way.

¶4.    The dispute is further complicated by the existence (or lack thereof) of two gates on Nicola Road: the Darwood Point gate (or the "new gate") and the Heitzmann gate (or "telephone pole gate").  Numerous witnesses testified as to both gates and often contradicted one another.  Harry Kelleher stated that there was a gate at the location of the current Darwood Point gate in the early 1960s, and it was generally kept locked.  Several witnesses stated that, historically, there had been a gate near or in the same spot as the current Darwood Point gate; however, the witnesses disagreed on whether the gate was locked, merely closed, or left open.  The trial court noted that several of the witnesses have clear bias against JRE because they do not want the area developed commercially.

4

¶5. The trial court, however, found that the Darwood Point gate, at its present location, was not in existence prior to 2007. Ronald Mentel, who previously owned the JRE tract, stated in his deposition that the first time he saw the "new gate" was after Hurricane Katrina, which took place in 2005. Jefferson Parker admitted that the Darwood Point gate was knocked down by Hurricane Katrina and not restored until 2007, but he also testified that the gate was there from at least 1998 until 2005. No witnesses contest that from 2005 to 2007, there was no Darwood Point gate. Parker gave Favre permission to erect the new gate, which he did in September 2007.

¶6. Between the Darwood Point gate and the Heitzmann gate is an area roughly forty-four feet wide and twenty-three feet long described as the "bottleneck." The bottleneck creates additional problems as Cinque Bambini described the right-of-way as sixty feet wide when it was created for the JRE track, but the bottleneck is roughly fifteen feet less. The Favres and Parkers argue that the descriptions in their deeds are clear and unequivocal and that the deeds provide boundaries for the "margin of the right of way" in the bottleneck. JRE attempted to stipulate that the right-of-way in the bottleneck was 43.87 feet wide; however, the stipulation was never entered, for reasons that are unclear to JRE. When the issue was submitted to the trial court, the trial court concluded that the right-of-way was sixty feet wide, but, prior to entry of judgment, the court suggested the parties attempt to agree on the metes-and-bounds description for the right-of-way in the bottleneck.

¶7. The Heitzmann gate is the second gate, north of the Darwood Point gate, and it falls within the 340-foot right-of-way. Kenneth Allison's uncontradicted testimony is that his

5

father-in-law constructed the Heitzmann gate sometime after Allison purchased the Heitzmann parcel in 1994 (the parcel was later bought by the Favres). The trial court found that the Heitzmann gate was a hindrance to the development of JRE's land and development of the easement right-of-way. It further found that, while both landowners had the right to use the right-of-way for ingress, egress, and utilities, an adjacent landowner did not have the right to erect a gate.

¶8. Putting aside the question of easements, the parties also dispute the status of Nicola Road as to being a public or private road. In March 2007, before the current Darwood Point gate was rebuilt by Scott Favre, Hancock County paved Nicola Road, stopping at the Heitzmann gate. Thus, the county paved roughly the first sixty-eight feet of the 340-foot right-of-way lying between the Darwood Point gate and the Heitzmann gate. Huey Stockstill, who paved the road for the county, testified that he simply followed the normal practice of beginning and ending where the county instructs him, which, here, was up to the Heitzmann gate. Scott Favre independently decided to utilize Stockstill's paving service and paid him to pave his driveway. There exists no disagreement among the parties that Nicola Road is a public road from Highway 603 to the Darwood Point gate. Rather, the disagreement is the status of the road between the Darwood Point gate and the Heitzmann gate and after the Heitzmann gate up to the private, 947-foot easement belonging to JRE. The area in dispute is referred to as the 340-foot right-of-way.

¶9. The trial court found that Nicola Road historically had been used as a public right-of-way through the 340-foot right-of-way, beyond the Heitzmann gate, and up to the southern

6

boundary of JRE's 947-foot easement. The court in large part based its finding on the survey of the land performed by Gene Paul Stenum. Stenum's firm had long been the surveyor of choice dating back to the original conveyance from Cinque Bambini to the ancestors-in-title of the JRE, Favre, and Parker North tracts. The trial court also found that the intent of the parties to the original conveyance contemplated a full-sized public road, as the plain language provided that the easement allowed for ingress, egress, and utilities, which is evidence that a public road was intended. Additionally, the trial court noted that the easement provided for a sixty-foot-wide road, which is the actual width of a full-sized road.

¶10. The trial court also found that Scott Favre is estopped from contending that the portion of the road paved by the county near his driveway is not public. Favre interprets the language as the court stating that his paying Stockstill to pave his driveway was direct evidence that the road past the Heitzmann gate was public. However, JRE interprets the language as the court stating that Favre was aware of and consented to the county paving the sixty-eight-foot portion of the 340-foot right-of-way that lies before the Heitzmann gate at public expense. JRE's interpretation is inconsistent with Favre's subsequent claim; Favre claims that the 340-foot right-of-way had not been dedicated for public use. Favre further argues that the trial court erred in raising *sua sponte* the estoppel issue, which must be pleaded as an affirmative defense under Mississippi Rule of Civil Procedure 8.

¶11. Additionally, Hancock County argues that, while there was an implied dedication of the portion of Nicola Road up to the Heitzmann gate, there is no evidence of such a dedication beyond the Heitzmann gate. In addressing such an argument, the trial court first

7

relied on the Stenum survey and the historic public nature of the road. Second, the trial court, relying on ***Moore v. Kuljis***, 207 So. 2d 604 (Miss. 1968), and ***Skrmetta v. Moore***, 30 So. 2d 53 (Miss. 1947), stated that the rule in Mississippi is that when

> a landowner offers to dedicate property and the public responds by using part of the dedicated property, this will be construed as acceptance of the landowner's offer and, more specifically, the public will be considered as having accepted a dedication of all of the property which was offered, including the portion of the property which has not been used by the public.

Thus, because the county has clearly accepted first sixty-eight feet of the 340-foot right-of-way up to the Heitzmann gate, the county necessarily must have accepted the entire 340-foot right-of-way (including the part past the Heitzmann gate) as an implied dedication. The county responds by arguing that such a rule is bad public policy and was merely *dicta* in ***Skrmetta***. Further, it states that ***Kuljis*** did not involve an implied dedication; thus, it is not applicable. The county cites several cases from other jurisdictions, including Illinois and Alabama, which follow a contrary rule, which the county would find to be a better public policy.

¶12.  JRE appears to have misinterpreted the county's argument, stating that the county's position that any unpaved portion of the right-of-way remains private property would produce a strange situation where the county owns a paved public road but the shoulders remain private property. Such an interpretation does not appear to be argued in the county's brief; instead, it appears to be arguing about the dedication not as to the width of the right-of-way, but as to the unpaved portion past the Heitzmann gate.

¶13.  Finally, the trial court granted JRE's request for injunctive relief to prevent irreparable

harm and further impediments to JRE's construction. Specifically, the trial court ordered that both the Darwood Point gate and the Heitzmann gate be removed, that the defendants are prohibited from erecting further gates, and that the defendants are prohibited from harassing, threatening or intimidating JRE or its invitees and licensees. The Favres argue that the injunction is overly vague and without factual basis as to the Parkers and Cindy Favre. They argue that, because the court did not actually make a judgment on the boundaries of the right-of-way, they are without sufficient information to comply with the injunction. Further, the Favres argue that there is no evidence demonstrating that the Parkers or Cindy Favre harassed, threatened, or intimidated JRE; thus, the portion of the injunction prohibiting such behavior has no factual basis.

¶14.    JRE paints a different picture of the actions of the Favres and Parkers. In its brief, JRE notes that Scott Favre would accost anyone who attempted to access the JRE tract via Nicola Road, threatening to impound their vehicles by shutting and locking the gate. Scott Favre would verbally harass anyone who entered, repeatedly used his rifle to shoot JRE's fence, construction permit, power pole, and a security camera, which he specifically is recorded as saying that "I shot it twenty times with a 223 . . . ." The trial court noted that the injunction does not prohibit merely Scott Favre because the remaining parties indirectly supported such actions as they generally knew of them.

¶15.    In summation, the trial court held that JRE shared a 340-foot right-of-way with the Favres and the Parkers, that JRE had an additional, private 947-foot easement leading to its tract, that the county, by way of implied dedication, publically owned Nicola Road, including

9

the 340-foot easement up to the southern border of JRE's 947-foot easement, and that, by way of injunction, the defendants would be prohibited from placing gates on the easements or from further harassing JRE. The Favres and Hancock County appealed.

## ISSUES

¶16. The Favres present nineteen issues on appeal, which JRE has adequately condensed into three larger issues:

> **(1) Whether the width of the right-of-way in the twenty-three-foot long "bottleneck" area is sixty feet or 43.87 feet.**
>
> **(2) Whether the chancery court erred in granting injunctive relief against all four individual defendants on the evidence presented, and whether the injunction is overbroad or insufficiently clear.**
>
> **(3) Whether any portion of Nicola Road has been dedicated for public use.**

## STANDARD OF REVIEW

¶17. The Court's "review of a chancellor's findings of fact is the manifest error/substantial evidence rule." *Biddix v. McConnell*, 911 So. 2d 468, 474 (¶ 17) (Miss. 2005) (quoting *Miss. State Tax Comm'n v. Med. Devices, Inc.*, 624 So. 2d 987, 989 (Miss. 1993)). The Court "has held that a chancellor's finding of fact may only be disturbed if the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or applied the wrong legal standard." *Biddix*, 911 So. 2d at 474-75 (¶ 17) (citing *Denson v. George*, 642 So. 2d 909, 913 (Miss. 1994)).

## DISCUSSION

> **(1) Whether the width of the right-of-way in the twenty-three-foot-long "bottleneck" area is sixty feet or 43.87 feet.**

10

¶18. The first issue on appeal is whether the width of the right-of-way in the bottleneck is sixty feet or 43.87 feet. The bottleneck, which is between the Darwood Point gate and the Heitzmann gate, is an area where the paved right-of-way is currently only 43.87 feet wide for the length of about twenty-three feet. Thus, if the right-of-way is determined to be sixty feet in width, the road would need to be widened.

¶19. In the trial court's Final Judgment, the trial court determined that, even in the bottleneck, the right-of-way is sixty feet wide. The Final Judgment states:

> The rights of way in the area north of the Darwood Point Gate are sixty feet wide at all points, any inconsistency in any deed or survey which suggests or indicates a width narrower than sixty feet at any point is disregarded, and the lands owned by Favre and Parker are burdened with the right of way to the extent that their deeded ownership encroaches in the sixty-foot wide right of way.

¶20. It is black-letter law that an "easement may be acquired by express grant, implied grant (implication), or prescription, which presupposes a grant to have existed." *Huggins v. Wright*, 774 So. 2d 408, 410 (¶ 8) (Miss. 2000) (quoting *Dethlefs v. Beau Maison Dev. Corp.,* 511 So. 2d 112, 116 (Miss. 1987)). In *Lanier v. Booth*, the Court stated that in the case of "an express grant, the fact of the creation of the easement, as well as its nature and extent, is determined by the language of the deed, taken in connection with the circumstances existing at the time of making it." *Lanier v. Booth*, 50 Miss. 410, 414 (1874). *Lanier* remains a cornerstone case cited either directly or indirectly through its progeny as to the law of easements. Descriptions of easements may be fairly general, they may include a metes-and-bounds description, the use of distances and directions, or references to natural or

11

artificial monuments; however, "[a]ny description of an easement needs accuracy and clarity." *Warren v. Derivaux*, 996 So. 2d 729, 736 (¶ 15) (Miss. 2008) (quoting *Moran v. Sims*, 873 So. 2d 1067, 1070 (¶ 15) (Miss. Ct. App. 2004)).

¶21.    On appeal, the parties do not seem to contest that JRE has a nonexclusive right of way in the area known as the bottleneck. As stated above, the trial court determined that the right of way is sixty feet wide at all points, based in large part on the deeds in the chain of title. The deed between Cinque Bambini and the Heitzmanns, which was later sold to Kenneth Allison and then to the Favres, describes the Favre tract as running "to the West margin of a 60 foot Road right-of-way." The deed between Cinque Bambini and Howard and Sarah Gaines, which would eventually be granted to the Parkers and known as the Parker North tract, similarly states that the tract runs "to an iron rod lying on the East margin of a 60 foot road right-of-way." Likewise, the tract granted to Kenneth Allison, which would later be granted to the Parkers as the Parker South tract, states that the land runs "to the northeasterly margin of Nicole [sic] Road." Based on the language of the deeds, as well as the contextual facts described above, the trial court did not commit manifest error in finding that the easement in question is sixty feet wide at all points. Thus, the only remaining question as to the bottleneck is how the sixty-foot easement encumbers the Favres' and/or Parkers' land, if at all.

¶22.    It is noteworthy that, during trial proceedings, JRE offered to accept and stipulate that the right-of-way in the bottleneck area is 43.87 feet in width. For reasons which remain unclear, the stipulation was not reduced to writing; thus, the decision was left to the chancery

12

court. From JRE's perspective, the only potential issue as to the bottleneck is a determination of the metes-and-bounds of the easement with a precise calculation as to how it encroaches on the Favre and Parker properties. However, JRE argues that the Favres have waived the right to obtain such a description, as they have failed to supply expert evidence to support a proper metes-and-bounds description. In other words, the Favres are requesting the Court to perform the work of a surveyor in order to supply evidence which is lacking in the record.

¶23. On the other hand, the Favres argue two main points. First, the Favres argue that finding the right-of-way to be sixty feet in width at all points is manifest error, as the Favre property is senior in title to the JRE property, and the deeds in the Favre chain of title have no specific width but reference the property continuing until the margin of the existing dirt roadway. Additionally, the Parker South parcel is not even in the same chain of title as JRE's tract. However, the facts that the Favres point to do not conclusively determine that the width of the easement should be less than sixty feet, as was determined by the trial court.

¶24. Second, the Favres argue that the trial court's ruling on the bottleneck is ambiguous, quoting a statement by the trial court prior to the entry of the Final Judgment stating that the parties should make some effort to determine the "exact mete-and-bounds of the easement that is burdening their estates." However, just before the quoted statement above, the trial court stated that "the land owned by defendants, Favre and Parker, is burdened with the plaintiff's easement to the extent that their deeded ownership encroaches in the 60-foot wide easement right-of-way." The trial court also stated that the Stenum and Williams surveys

13

could determine the metes-and-bounds description of the easement and that, where the surveys are inconsistent, the trial court would find the Stenum survey to be controlling. However, according to the Favres, the Stenum survey does not include a metes-and-bounds description.

¶25. Regardless of what the trial court said in its ruling, the Final Judgment states that "any inconsistency in any deed or survey which suggests or indicates a width narrower than sixty feet at any point is disregarded." Further, the Final Judgment correctly states that it supersedes the court's ruling delivered from the bench and any other rulings that are inconsistent with the Final Judgment's factual findings and legal conclusions. *See Grey v. Grey*, 638 So. 2d 488, 492 (Miss. 1994) (stating that a bench ruling is not "the same thing as the court's final judgment" and is "subject to modification") (citing *Banks v. Banks,* 511 So. 2d 933, 935 (Miss. 1987); *Love v. Barnett,* 611 So. 2d 205, 208 (Miss. 1992)).

¶26. In its Final Judgment, the trial court addressed the bottleneck, writing that the clear intention of the original grantor or grantee for the easement to be sixty feet wide at all points prevails over the conflicting descriptions of the easement. The trial court goes on to describe Stenum and his survey, noting that Stenum's firm was directly involved in the original conveyance by Cinque Bambini and that it is the highest grade survey produced as to the land in question. The trial court also addressed JRE's proposed widening of the paved road on the right-of-way to the full sixty feet. The court stated that the road may be widened according to the Stenum Realignment Survey by using only portions of land owned by Cinque Bambini, the servient owner. The Stenum Realignment Survey is a Class B survey

14

that is highly detailed and drawn to scope and includes a metes-and-bounds description of the easement, contrary to assertions made by the Favres and Parkers. It demonstrates that the expansion of the right-of-way, including at the bottleneck, can be performed entirely on the servient land owned by Cinque Bambini, without burdening the Favre and Parker parcels.

¶27. The trial court did not commit manifest error in its Final Judgment, which expressly provides that the easement is sixty feet wide at all points. The trial court found that the Stenum Realignment Survey was the most reliable survey and relied heavily on the testimony by Stenum, whose firm has been involved with the land since the original conveyance from Bambini to the ancestors-in-title of the land. The record does not contain anything suggesting that the trial court committed manifest error in finding the Stenum Realignment Survey to be controlling. Therefore, the issue is without merit.

**(2) Whether the chancery court erred in granting injunctive relief against all four individual defendants on the evidence presented, and whether the injunction is overbroad or insufficiently clear.**

¶28. The next issue on appeal concerns whether the chancery court erred in granting injunctive relief without factual basis against the four individual defendants and whether the injunction was overly vague. First, the Favres and the Parkers argue that the injunction, enjoining them from acting in a harassing or intimidating manner, is not specific and does not provide the necessary notice required for such an order that may result in a contempt citation. The Favres and Parkers also argue the injunction lacks specificity because the trial court did not make a judgment on the boundaries of the right-of-way, and the boundaries must be known to comply with the injunction because it prohibits them from erecting gates,

15

posts, or objects that impair use of Nicola Road. Finally, they take issue with the injunction prohibiting Cindy Favre and the Parkers from harassing and intimidating JRE. In effect, they argue that there is no evidence that they indirectly harassed and intimidated JRE through tacit support of Scott Favre's actions.

¶29. JRE responds by stating essentially that the argument, as to the boundaries of the right-of-way, is simply a rehash of the first issue presented and addressed above. JRE argues the trial court clearly determined that the right-of-way was sixty feet in all areas, and even though the trial court did not provide a metes-and-bounds description, the defendants had ample information to know what behavior is permissible and what behavior is prohibited by the injunction. Additionally, JRE argues that the injunction prohibiting the Parkers and Cindy Favre from harassing and intimidating JRE has a factual basis, as exhibited by Scott Favre's violent behavior. Further, there was enough information in the record that suggested that the Parkers and Cindy Favre tacitly supported Scott Favre's actions, as the defendants knew of his actions and did nothing to stop them.

¶30. The general rule controlling the form of an injunction has been stated as follows: "A decree should be complete within itself, –containing no extraneous references, and leaving open no matter or description out of which contention may arise as to the meaning . . . ." *Georgia Pac. Corp. v. Armstrong*, 451 So. 2d 201, 207 (Miss. 1984) (quoting *Morgan v. U.S.F.G.*, 191 So. 2d 851, 854 (Miss. 1966)); *see also* *Stinson v. Barksdale*, 245 So. 2d 595, 597 (Miss. 1971); Miss. R. Civ. P. 65 ("Every order granting an injunction shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not

16

by reference . . . the act or acts sought to be restrained . . . ."). Trial courts are to balance four factors: "(1) there exists a substantial likelihood that plaintiff will prevail on the merits; (2) the injunction is necessary to prevent irreparable harm; (3) the threatened harm to the applicant outweighs the harm the injunction might do to the respondents; and (4) . . . the injunction is consistent with the public interest." *Secretary of State v. Gunn*, 75 So. 3d 1015, 1020 (¶ 14) (Miss. 2011) (citing *Am. Legion Post # 134 v. Miss. Gaming Comm'n*, 798 So. 2d 445, 454 (Miss. 2001)).

¶31. Here, the trial court found ample reasons for issuing its injunctive relief as to the threatening behavior. Scott Favre fired a gun across the fence and claimed he was testing the boundary line and made several threatening remarks to JRE contractors. Further, Jefferson Parker has played an important part in impeding JRE's development through the neighborhood organization. The trial court summarized its findings as following:

> The Court holds that Defendants Scott Favre and Jefferson Parker have harassed and intimidated the Plaintiff JRE; Scott Favre both directly and indirectly and Jefferson Parker indirectly. There appears to the Court a likelihood that other Defendants may have also participated indirectly, but their participation, if any, has not been established with certainty. However, due to the real potential that some of the Defendants could continue to harass and intimidate the Plaintiff indirectly through others who may not be parties to the litigation, the Court finds it necessary to enjoin all of the Defendants from harassing, intimidating and threatening the Plaintiff.

¶32. The trial court also addressed the need for injunctive relief requiring the removal of any gates which obstruct Nicola Road. The trial court stated that the Darwood Point Gate obstructs the public's use of Nicola Road and that public use of the road is imperative for the development of the property; therefore, obstructing the road would cause irreparable harm

17

to JRE. The trial court made a similar finding as to the Heitzmann Gate. Additionally, the trial court specifically found that each of the four *Gunn* factors is present in the instant case. The trial count concluded its fact finding by stating that the "entry of this injunction is in the public interest and will promote public use of Nicola Road."

¶33. Injunctions as to harassment and intimidation are routinely issued and are not deemed overly vague. Further, the instant injunction is specific in that it required the defendants to remove any gates restraining the Nicola Road easements, prohibited the defendants from erecting any future gates, and enjoined the defendants from any sort of harassment or intimidating behavior as to JRE, its invitees, or licensees. The trial court also relied on the Stenum Realignment Suvey and clearly determined that the right-of-way was sixty feet in all areas. Finally, the trial court expressly detailed how each of the four *Gunn* factors is found in the case *sub judice*. Thus, we hold that, under the pertinent standard of review, the trial court committed no reversible error.

### (3) Whether any portion of Nicola Road has been dedicated for public use.

¶34. The final argument presented on appeal is whether any portion of Nicola Road has been dedicated for public use. The parties all agree that, at the very least, the public right-of-way extends up to the Darwood Point gate.

¶35. Relying on the cases of *Moore v. Kuljis*, 207 So. 2d 604 (Miss. 1968), and *Skrmetta v. Moore*, 30 So. 2d 53 (Miss. 1947), the trial court determined that, when the county accepted an implied dedication of Nicola Road, it accepted all of the property that was

18

offered, including the portion of the property which has not been used by the public. Thus, even though the county paved the road only up to the Heitzmann gate, it was deemed to have accepted all of the land offered, which the court determined to be the full 340-foot right-of-way. In determining that the full 340-foot right-of-way was offered to the county, the trial court relied on the testimony of Tim Johnson, an indemnity agreement between JRE and Cinque Bambini, and the admissions of Hancock County.

¶36. Hancock County argues that the so-called *Skrmetta* rule is against public policy and that, instead, the county should be free to accept a portion of an offer for dedication without accepting all of it. Such an alternative rule would follow precedent established in Illinois and Alabama, among other states. *See Chalkley v. Tuscaloosa County Comm'n*, 34 So. 3d 667 (Ala. 2009); *Johnson v. City of Niagara Falls*, 230 N.Y. 77, 129 N.E. 213 (1920); *Moore v. City of Chicago*, 261 Ill. 56, 59, 103 N.E. 583 (1913); *Hall v. City of Meriden*, 48 Conn. 416, 1880 WL 2338 (1880).

¶37. The Favres and Parkers argue that the witnesses who testified at the trial could not attest that the Darwood Point gate was there from 2005 to 2007; therefore, the trial court's determination that the gate had existed prior to 2007 was not supported by the testimony of the witnesses. The Favres and Parkers then appear to say that, since there was historically a gate blocking the road, the road cannot be public and must end at the location of the Darwood Point gate. Further, they state that there is no evidence that Hancock County intentionally paved past the Darwood Point gate. Finally, they take issue with the trial court's application of the doctrine of estoppel. The trail court estopped Scott Favre from

19

complaining that Hancock County erroneously paved a portion of the road past the Darwood Point gate when the evidence establishes he ordered the concrete and witnessed the road being paved. The trial court also estopped him from claiming the portion of the road paved by Hancock County near his driveway is not public. The Favres and Parkers assert that, under Mississippi Rule of Civil Procedure 8, estoppel must be specifically pleaded. Because JRE did not plead estoppel as a defense, the trial court erred in raising it *sua sponte*.

¶38. Dedication is a process in which private land may be transferred to the public. In Mississippi, there are two types of dedication: common law and statutory. ***Nettleton Church of Christ v. Conwill***, 707 So. 2d 1075, 1076 (¶ 4) (Miss. 1997). One of the main distinctions between the two types is that "common law dedication operates by way of an equitable estoppel, whereas a statutory dedication operates by way of grant." ***Id.*** Here, it is clear that the trial court found that the land had been dedicated by way of the common law, as the trial court relied on cases such as ***Skrmetta*** and ***Kuljis*** and did not cite any particular statute.

¶39. The Favres and Parkers also argue that the trial court erred by raising *sua sponte* the defense of estoppel. However, their argument rings hollow, as common law dedications are deemed to be a form of equitable estoppel. Further, JRE argued in its Second Amended Complaint that the road was a public right-of-way and asked the trial court to rule on whether or not Nicola Road had been publically dedicated to Hancock County. Thus, JRE raised the dedication issue itself, not the trial court.

¶40. The trial court here found that the entire 340-foot public right-of-way on Nicola Road had been implicitly dedicated to the county. When a landowner offers to dedicate property

20

and the public responds by using the dedicated property, the public's actions are construed to be an implied acceptance of the offer. *City of Louisville v. Hull*, 292 So. 2d 177, 179 (Miss. 1974) ("An implied dedication results only from long use for a specific public purpose, the discontinuance of which would constitute a violation of good faith to the public and to those who have acquired private property with a view to the use contemplated by the dedication.").

¶41. First, there is ample evidence demonstrating that the 340-foot right-of-way on Nicola Road had been offered for dedication to the County. Cinque Bambini and JRE entered an indemnity agreement in which Cinque Bambini agreed to

> . . . fully cooperate in all reasonable and necessary actions to pursue public dedication of a 60 foot [wide] right of way commencing at the point on the northeast side of Jourdan Bluff Road (previously dedicated) and running north and thence northwesterly along Nicola Road to a point located on the perpetual non-exclusive easement currently owned by JRE, which is more particularly described in that certain Warranty Deed from Ronald A. Mentel and Judith L. Mentel to Jourdan River Estates, LLC, . . . or to *publicly dedicate those parts of the 60 foot right of way which have not previously been taken by Hancock County* through adoption, prescription, dedication, implied dedication or otherwise.

(Emphasis added.) The offer for dedication also is apparent from testimony by Tim Johnson, manager of Cinque Bambini:

> Q.    And if this Court finds that [Nicola Road is] not a public road, is it also your testimony and in that indemnity agreement that Cinque Bambini is willing to dedicate what it needs to dedicate to make it a public road?
> A.    We are, yes, that's correct.

The indemnity agreement as well as Tim Johnson's testimony conclusively demonstrate that the 340-foot right-of-way on Nicola Road had been offered for dedication.

21

¶42. "[L]ong-standing permission to all the public to travel along [a] road [is evidence of] an implied dedication." *Hawkins v. Smith County*, 954 So. 2d 526, 529 (¶ 9) (Miss. Ct. App. 2007) (citing *Armstrong v. Itawamba County*, 16 So. 2d 752, 757 (Miss. 1944)). Implied dedications may arise from "those acts which unequivocally manifest an intention that the community shall have and enjoy a highway on his private property. When the public accepts his offer . . . there has been accomplished what is expressed by the term 'dedication.'" *Armstrong*, 16 So. 2d at 757.

¶43. Here, Hancock County accepted the offer for dedication by way of its actions. The county voluntarily undertook a project to pave a portion of the 340-foot right-of-way on Nicola Road when it paved the road up to the Heitzmann gate. The county's paving of the road is sufficient evidence that the county controlled the road and repaired it on the assumption that the road was public. *See Jennings v. Patterson*, 488 F.2d 436 (5th Cir. 1974); *Luter v. Crawford*, 92 So. 2d 348 (Miss. 1957). Additionally, testimony from Ronald Mentel, the previous owner of the JRE property, supports the argument that the county had implicitly accepted the offer for dedication by way of the long standing public use of the road:

Q.    . . . you believed Nicola Road was public to the Heitzmann gate?
A.    Yes, I thought so. I went down it, everybody went down it.

Based on Mentel's testimony and the county's act to pave and maintain the road up to the Heitzmann gate, Nicola Road was offered for dedication, and Hancock County's actions deemed the offer accepted.

22

¶44. The question now shifts to whether the county accepted the entire 340-foot right-of-way or something less. The county contends that it has accepted the dedication of the road only up to the Heitzmann gate, where the county stopped paving. However, the trial court found that the county had accepted the entire 340-foot right-of-way, relying on *Skrmetta* and *Kuljis*.

¶45. In *Skrmetta*, the parties argued over the ownership of a strip of land which could be seen as a continuation of Oak Street in Biloxi, Mississippi, to the Gulf of Mexico. The Court wrote:

> The original patentee and his heirs being estopped to deny that there was such a street or way as Oak Street, . . . the conclusion follows that, in and by the original plat or survey and the conveyances made by reference to it, the original patentee had made a dedication of that street throughout its *entire length and width* to the public use . . . .
>
> There is no evidence of any formal acceptance by the public authorities of the dedication of Oak Street, but if an acceptance was necessary in such a case as this, the evidence is ample that part of Oak Street north of East Beach Street has been actually accepted and improved as a city street for a width of 60 feet and for a time long back into the past, and *this was sufficient to extend the acceptance to the Gulf and to authorize its actual improvement by the public authorities as a street with the same width from East Beach Street to the Gulf when the public interest required it to be done.* See for instance 26 C.J.S., Dedication, § 41, p. 112, and *Shoemaker v. Coleman*, 94 Miss. 619, 625, 47 So. 649.

*Skrmetta*, 30 So. 2d at 56 (emphasis added). The trial court here relied on *Skrmetta*, as well as *Kuljis*, which quotes *Skrmetta*, for the proposition that the acceptance of a dedication of part of a street is evidence of the acceptance of the entire street. While *Skrmetta* advances such a proposition, we note that the relevant parts of both *Skrmetta* and *Kuljis* are dicta, as

23

they are unnecessary to reach the Court's holdings. Both cases concerned disputes between two property owners, and the respective municipalities ultimately did not hold title to the streets in question. In *Skrmetta*, after the above-quoted language, the Court stated that the rule does not apply, as the parties to the case stipulated that "the City of Biloxi does not own the property in question." *Skrmetta*, 30 So. 2d at 56. Therefore, while *Skrmetta* and *Kuljis* are helpful authorities, they are not necessarily binding on the Court today.

¶46. Even though the rule in *Skrmetta* did not directly apply to its facts, the *Skrmetta* rule appears to be the majority rule. "In some cases, acceptance of part of a single street offered for dedication by play is acceptance of that part only and does not necessarily extend to the entire street. Generally, however, acceptance of part of the street amounts to acceptance of the entire street." 23 Am. Jur. 2d, *Dedication* § 43 (2002) (citing *Smith v. City of Melbourne*, 211 So. 2d 66 (Fla. Dist. Ct. App. 4th Dist. 1968); *Hooker v. City of Grosse Pointe*, 328 Mich. 621, 44 N.W.2d 134 (1950)). JRE discusses some of the public policy reasons for such a rule in its brief, arguing that if the Court allowed partial acceptance, landowners and counties alike could change their mind as to any unused portion of land that previously was dedicated. The county's rule would create uncertainty in who owns land, as, with implied dedications, the only land filing would be a plat which offers the land for dedication. If a county sits on the offer for dedication for a lengthy period and ultimately decides to accept only a portion, the land necessarily still wil be controlled by the person offering dedication, despite the reasonable assumption, based on the inaction of a county, that the entire piece of land has been dedicated. One can easily imagine potential tax problems

24

or adverse possession occurring on the land in the intermediate period between the offer to dedicate and the partial acceptance.

¶47. Arguing that action by a county's Board of Supervisors is required for a county to accept a road, Hancock County submitted supplemental authorities to the Court under Mississippi Rule of Appellate Procedure 28(j) post oral argument. Rule 28(j) allows a party to submit supplemental authorities after oral argument in the form of a letter if the party references the page of the brief or a point argued orally to which the authority refers. Miss. R. App. P. 28(j). The supplemental authorities from the county merely state: "[t]hese citations are pertinent to the issue of what portion of the easement at issue is a public road." JRE argues that the supplemental authorities were not submitted appropriately and that they neither reference the brief nor oral argument.

¶48. The county failed to submit the authorities in letter form, and it failed to reference an appropriate reason for authorities under Rule 28(j). Therefore, the Court holds that the supplemental authorities were not submitted appropriately under Rule 28(j). In the interest of justice, the Court considered the authorities, but even in light of the supplemented authorities, the outcome of the issue stands unaffected.

¶49. Hancock County cites Section 65-7-4 of the Mississippi Code, which states in pertinent part: "From and after July 1, 2000, no road shall be added or deleted from the county road system or otherwise changed except by order or other appropriate action of the board of supervisors . . . ." Miss. Code Ann. § 65-7-4(6) (Rev. 2012). Section 65-7-4 also states: "On or before July 1, 2000, the board of supervisors of each county shall prepare and

25

adopt an official map designating and delineating all public roads on the county road system. . . ." Miss. Code Ann. § 65-7-4(1). Hancock County then cites Section 65-7-57 for the proposition that a county may make a road public "in whole or in part." Miss. Code Ann. §65-7-57 (Rev. 2012). JRE argues that dedication is still allowed as a means of acquiring roads because in 2007 the Court of Appeals upheld it as a means in *Hawkins*, 954 So. 2d at 528.

¶50. Sections 65-7-4 and 65-7-57 deal specifically with express methods of acquiring a county road, and under the plain meaning of the statutes, they leave open other alternatives to acquiring county roads, such as prescription and dedication. Therefore, we agree with *Hawkins* that dedication still is an appropriate means of acquiring county roads. *See Hawkins*, 954 So. 2d at 528.

¶51. In the alternative, Hancock County failed to provide the Court with a map of Hancock County in 2000, and it failed to show that since 2000, Nicola Road has not been added to the county as a county road under the appropriate methods as set out by Section 65-7-4. In fact, in *Favre v. Hancock County Board of Supervisors*, the Board of Supervisors of Hancock County approved the plan for development of JRE's land subject to the "approv[al of] the plans for the road providing ingress and egress for the development" by the Hancock County Engineer. *Favre v. Hancock County Bd. of Supervisors*, 52 So. 3d 463, 465 (¶ 15) (Miss. Ct. App. 2011). The Court of Appeals held, "The deed to Jourdan River's property includes an easement for access, which ends at the terminus of Nicola Road. According to a survey commissioned by the Hancock County Engineer, Hancock County had been maintaining

26

Nicola Road up to the point where Jourdan River's easement begins." *Id.* at 467. Therefore, under Sections 65-7-4 and 65-7-57, Hancock County's Board of Supervisors has expressly and correctly accepted the full 340-foot right-of-way as a county road up to the 947-foot private easement belonging to JRE.

¶52.    The court further relied on a survey preformed by Dane C. Wren in 1989 and filed with Hancock County attached to the deed of Cinque Bambini to Ronald and Judith Mentel -- who later sold their tract to JRE. In the survey preformed by Wren, Nicola Road is denoted as both "Nicola Road" and "County Road." Thus, the county accepted Nicola Road as a county road prior to 2000. Moreover, it is "well-settled law in Mississippi that land sold according to a plat or map will dedicate the streets, alleys, squares, and other public ways marked on the map or plat to the public for public use." *Nettleton Church of Christ*, 707 So. 2d at 1076 (¶ 5). The trial court here did not discuss any plats which might demonstrate that the 340-foot right-of-way was dedicated to the county; however, the survey completed by Wren and filed with the county in 1989 shows Nicola Road as a county road. Under *Nettleton*, although the Wren survey does not indicate specifically which part of the road is public and which part is private, it can be taken generally for the point that Nicola Road has been considered a county road since 1989.

¶53.    We hold that the supplemental authorities have no merit and that *Skrmetta* is the law in Mississippi. *Skrmetta* does not preclude counties from following the formal process of accepting a road under Mississippi Code Section 65-7-4 or from expressly indicating that they accept only a portion of an offer for dedication; rather, it prohibits counties from

27

impliedly accepting only a portion of an offer by way of public use. *Skrmetta*, 30 So. 2d at 56. Based on the rule set forth in *Skrmetta*, the trial court did not err in its determination that the entire 340-foot right-of-way was dedicated to the county. Even if there is any question that the county indicated acceptance of only a portion of the road, the issue remains without merit because, based on the approval of the road plans by the Hancock County Engineer and the depiction of Nicola Road as a "county road" by the plat filed with the county, the county accepted the entire 340-foot right-of-way.

## CONCLUSION

¶54. We affirm the trial court's Final Judgment, although partially on different grounds. The issue concerning the width of the bottleneck is without merit, as the trial court expressly determined that the easement was sixty feet wide at all points and that it is dictated by the Stenum Realignment Survey. As to the propriety of the injunctive relief, the trial court did not manifestly err in requiring the Favres and the Parkers to remove any gates blocking the easements and to refrain from intimidating behavior toward JRE or its invitees or licensees. Finally, the trial court did not err in determining that the county accepted the entire 340-foot right-of-way via implied dedication demonstrated by the actions of the county and expressly under Section 65-7-4 of the Mississippi Code. Therefore, we affirm the judgment of the Hancock County Chancery Court.

¶55. **AFFIRMED.**

**WALLER, C.J., LAMAR, KITCHENS, CHANDLER, PIERCE AND KING, JJ., CONCUR. DICKINSON AND RANDOLPH, P.JJ., NOT PARTICIPATING.**

28