# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-CA-00658-COA

RICHARD C. SWENSON                                                              APPELLANT

v.

JAMES KERMIT BROUILLETTE AND                                   APPELLEES
SHARON ISABELLE EMERSON
BROUILLETTE, BOTH INDIVIDUALLY, AND
AS TRUSTEES OF THE JAMES AND SHARON
BROUILLETTE LIVING TRUST

| | |
|---|---|
| DATE OF JUDGMENT: | 12/19/2012 |
| TRIAL JUDGE: | HON. M. RONALD DOLEAC |
| COURT FROM WHICH APPEALED: | PEARL RIVER COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | G. GERALD CRUTHIRD |
| | PEGGY HIRSCHEY-WILLIAMS |
| ATTORNEYS FOR APPELLEES: | CLAIBORNE MCDONALD |
| | GAIL D. NICHOLSON |
| | GERALD C. PATCH |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| TRIAL COURT DISPOSITION: | DENIED APPELLANT'S CLAIMS THAT HE WAS ENTITLED TO AN APPURTENANT EASEMENT, A PRESCRIPTIVE EASEMENT, AND AN EASEMENT BY NECESSITY |
| DISPOSITION: | AFFIRMED - 10/07/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE GRIFFIS, P.J., ROBERTS AND CARLTON, JJ.**

**ROBERTS, J., FOR THE COURT:**

¶1.     Richard Swenson sued his neighbors, James and Sharon Brouillette (the Brouillettes),

and claimed he was entitled to an easement over their property. Specifically, Swenson

claimed he was entitled to a prescriptive easement and an easement by necessity. The Pearl

River County Chancery Court found no merit to Swenson's claims. Additionally, the chancellor found that Swenson failed to prove that he was entitled to damages for trees that the Brouillettes had trimmed. Swenson appeals. Finding no error, we affirm the chancellor's judgment.

**FACTS AND PROCEDURAL HISTORY**

¶2. Over the course of thirty-five years, Swenson acquired more than 120 acres of real estate in Pearl River County.[1] The current litigation centers on his access to a twenty-eight-acre parcel.[2] According to Swenson, the most convenient way for him to access that parcel with heavy equipment was to use a private road called Oak Leaf Drive West, which intersected with Carey Byrd Road, a public road. The private road ran across the Brouillettes' property.[3] To be precise, the private road was the Brouillettes' driveway. To access the twenty-eight acres, Swenson had to pass through a gate on the Brouillettes' property, and another gate that led to the twenty-eight acres.

¶3. The record indicates that the dispute between Swenson and the Brouillettes began when the Brouillettes built their home near the property line that they shared with Swenson.

---

[1] Swenson bought his first parcel of property, which totaled approximately seventy-two acres, during 1977.

[2] Swenson's predecessor in title had an express easement over the property that the Brouillettes eventually bought. However, Swenson's predecessor in title did not convey the express easement when Swenson acquired the property. At the time of the trial, Swenson leased the twenty-eight acres to people who used approximately twenty acres to cut hay. The remaining eight acres was described as wooded "low land."

[3] Through a corporation, the Brouillettes acquired their first parcel in the area during 1979. Eventually, the Brouillettes transferred ownership of their property from the corporation to a living trust.

According to Swenson, the Brouillettes built their house too close to the property line. Swenson also disliked the fact that the back of the Brouillettes' unfinished home, which he described as "that menagerie," was visible from his own house. At trial, Swenson testified that the back of the Brouillettes' home "was like going into an alley in New Orleans." He also said that it "was always trashy." However, by the time the parties went to trial, the Brouillettes had finished improving the back of their home.

¶4.     Meanwhile, Swenson had been improving aspects of his own property. He built two lakes near his home, which involved hauling in truckloads of dirt to construct a dam. There was testimony that Swenson could access the twenty-eight acres by driving or walking across the dam. However, Swenson testified that the dam was insufficient for regular residential traffic, and it was only useful in dry weather. According to Swenson, heavy traffic would cause the dam to erode.

¶5.     At some point, the Brouillettes installed a gate across the private road.[4] It is similarly unclear when James Brouillette placed a lock on the gate. According to James, he gave Swenson a key to the lock. James testified that he allowed Swenson to use the private road because he was being a "good neighbor." James further testified that Swenson lost the first key that he gave him, so he gave Swenson another key to the lock. Swenson disputed that James had ever given him a key to the lock. According to Swenson, he cut James's lock off of the gate and placed a combination lock on it.

¶6.     The catalyst that led to the lawsuit seems to have arisen over trees near the property

---

[4]   The parties could not recall when the Brouillettes installed the gate across the private road, but it appeared to have been sometime between 1991 and 1997.

line that Swenson and the Brouillettes shared. Because the branches and pine needles were causing damage to the Brouillettes' roof, James asked Swenson for permission to have some of the trees trimmed. Swenson denied his request. According to Swenson, he felt that the Brouillettes placed their house "in harm's way" when they built their "house right next to the property line." Swenson also said he "was offended by it." Consequently, James paid a tree service extra to trim the trees without trespassing on Swenson's property. However, Swenson was adamant that some of the trees had landed on his property. Swenson called the Pearl River County Sheriff's Department and attempted to charge James with trespassing. Although local authorities spoke to James, it appears that no charges were pursued.

¶7. A short time later, James's son, Kirt Brouillette, saw Swenson leave his parents' property by way of the private road. Swenson did not shut the gate that led to Carey Byrd Road. Kirt followed Swenson home and asked him why he did not close the gate. According to Kirt, Swenson told him that the gate to Carey Byrd Road was to be left open from then on.

¶8. In response, James decided that he would not allow Swenson to use the private road. James also went to the Pearl River County Chancery Clerk's office and discovered that Swenson did not have an easement over the private road. James put a new lock on the gate that led to Carey Byrd Road while Swenson was on the twenty-eight acres. As a result, Swenson was actually locked in on the Brouillettes' property. Swenson responded by cutting the lock off of the Brouillettes' gate while James watched. In response, James removed the gate that led from the private road to the twenty-eight acres, and left the gate on Swenson's property. To fill the gap in the fence, James drove posts in the ground and strung barbed wire across the opening. James also placed "no trespassing" signs on the area where the gate

4

had been.

¶9.     Swenson sued the Brouillettes. In his complaint, he claimed that he was entitled to a prescriptive easement and an easement by necessity. Swenson also asked the chancellor to award him damages related to the trees that the Brouillettes had cut. On August 1, 2012, Swenson and the Brouillettes went to trial. Swenson's testimony spanned the entire first day of trial, and continued during August 2, 2012. Swenson also called his wife, Vivian, and five other witnesses to support his claims.

¶10.    Due to Hurricane Isaac, the trial was continued until September 12, 2012. At that time, the Brouillettes unsuccessfully moved for a directed verdict. Afterward, the Brouillettes called four witnesses, including Kirt and James.[5] Swenson testified again during his rebuttal.

¶11.    Ultimately, the chancellor found that Swenson was not entitled to a prescriptive easement because the Brouillettes had given him permission to use the private road. The chancellor also held that Swenson was not entitled to an easement by necessity because Swenson could access the twenty-eight acres by two other means, including driving across the dam to the lakes that he had built. The chancellor also found no merit to Swenson's claim, which arose during the course of the trial, that Swenson was entitled to an appurtenant easement. Finally, the chancellor found that Swenson had failed to prove that he was entitled to damages for his trees because he put on absolutely no proof regarding damages. Swenson appeals.

**STANDARD OF REVIEW**

---

[5] James was eighty-two years old at the time of the trial.

¶12. "Unless they were either manifestly wrong or clearly erroneous, we will not disturb the chancellor's findings on appeal." *Harkness v. Butterworth Hunting Club Inc.*, 58 So. 3d 703, 705 (¶6) (Miss. Ct. App. 2011). "If there is substantial evidence that supports the chancellor's decision, we will affirm." *Id.*

## ANALYSIS

### I. APPURTENANT EASEMENT

¶13. Swenson claims the chancellor erred by denying his request for an appurtenant easement. The Brouillettes argue that Swenson did not properly raise this theory in his complaint, and it was not tried by their consent. We agree.

¶14. An appurtenant "easement requires no written conveyance because it is a vested right for successive holders of the dominant tenement and remains binding on successive holders of the servient tenement." *Pitts v. Foster*, 743 So. 2d 1066, 1069 (¶8) (Miss. Ct. App. 1999). By acquiring a dominant estate, "one has already paid for and procured the legal right of access to and from that parcel." *Broadhead v. Terpening*, 611 So. 2d 949, 955 (Miss. 1992). In other words, an appurtenant easement "runs with the land." *Id.* at 954.

¶15. During Swenson's cross-examination, he testified that he "assume[d that he] had the right to use the [private] road." The Brouillettes' attorney asked Swenson whether he intended to "adversely possess" it. Before Swenson could answer, his attorney objected and said that Swenson's "testimony reflects that *he has two theories of a right to the easement*." (Emphasis added). Afterward, the chancellor attempted to clarify Swenson's argument. The chancellor asked whether Swenson had claimed that he was entitled to an easement by prescription and necessity. Swenson's attorney responded, "Yes, sir."

6

¶16.   The Brouillettes' attorney attempted to further clarify the point.   He asked the chancellor whether Swenson was claiming that he had an easement "by virtue of the deed." The chancellor said, "I'm hearing Mr. Swenson say [that] when he bought the [twenty-eight] acres, he thought the easement went with it and he had the right to use the easement."

¶17.   Swenson rested his case-in-chief on August 2, 2012.  As previously mentioned, due to Hurricane Isaac, the parties were not able to reconvene until September 12, 2012.  On that date, the parties addressed the Brouillettes' motion for a directed verdict.  In response to the Brouillettes' argument in favor of their motion, Swenson's attorney argued that the evidence supported Swenson's claims for a prescriptive easement and an easement by necessity.  Then, Swenson's attorney stated: "[W]e would submit to the [c]ourt [that] there is really a third ground to grant the easement and it - - it either is - - it came first, or the necessity came later and grew out of it, but it is an easement by appurtenance . . . ."  That was the first time that Swenson or his attorney mentioned that theory.

¶18.   The Brouillettes' attorney objected "because that issue hasn't been raised in the pleadings."  Swenson's attorney argued that it had been raised "through the assertion of the doctrine of implied necessity."  The chancellor denied the Brouillettes' motion for a directed verdict, but he never resolved their objection to Swenson's attempt to raise an appurtenant-easement claim.

¶19.   After the chancellor ruled against Swenson, he filed a posttrial motion "to alter or amend the judgment" or, alternatively, for a new trial.  During the hearing on Swenson's posttrial motion, Swenson's attorney claimed that the complaint included "the facts pertaining to th[e appurtenant-easement] theory . . . ."  The Brouillettes' attorney argued that

7

the appurtenant-easement theory was not "evident from the pleadings," and "that theory was not brought up until after the plaintiff rested . . . ." Ultimately, the chancellor denied Swenson's posttrial motion. Although he did not specifically address Swenson's claim that he had sufficiently placed the Brouillettes on notice of his appurtenant-easement theory, we interpret the chancellor's denial of Swenson's posttrial motion as his implicit decision that Swenson had not properly raised it.

¶20. "[P]laintiffs are bound by what is alleged in the complaint, absent a subsequent amendment or modification." *Powell v. Clay Cnty. Bd. of Supervisors*, 924 So. 2d 523, 527 (¶11) (Miss. 2006). "However, the pleadings need only provide sufficient notice to the defendant of the claims and grounds upon which relief which is sought." *Scott v. City of Goodman*, 997 So. 2d 270, 276 (¶14) (Miss. Ct. App. 2008). Stated differently, Swenson's complaint did not have to contain the words "appurtenant easement." *See McNabb v. L.T. Land & Gravel LLC*, 77 So. 3d 1140, 1143 (¶12) (Miss. Ct. App. 2011). "[E]ven under the liberal pleading requirements of Rule 8(a) [of the Mississippi Rules of Civil Procedure], a plaintiff must set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Penn Nat'l Gaming Inc. v. Ratliff*, 954 So. 2d 427, 432 (¶11) (Miss. 2007).

¶21. In his complaint, Swenson claimed that he was entitled to an easement under two theories: prescription and necessity. Swenson's complaint contains no mention of an appurtenant easement. In fact, the word "appurtenant" does not appear anywhere within Swenson's complaint. Additionally, the complaint failed to allege that Swenson claimed an easement that "runs with the land." Nor did Swenson's complaint allege that he was entitled

8

to an easement because his predecessor in title had one. We find that Swenson's complaint did not properly allege that he claimed that he was entitled to an appurtenant easement.

¶22. Next, it is necessary to determine whether the appurtenant-easement theory was tried by consent as set forth in Rule 15(b) of the Mississippi Rules of Civil Procedure. According to Rule 15(b):

> If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the maintaining of the action or defense upon the merits.

"A finding that an issue was tried by implied consent depends upon whether the parties recognize that a new issue was being litigated at trial. Where the questions asked or the evidence presented at trial are relevant to the issues actually raised in the pleadings, trial by implied consent will not be found." *McCarty v. Kellum*, 667 So. 2d 1277, 1283 (Miss. 1995).

¶23. The first mention of Swenson's appurtenant-easement theory occurred during Swenson's argument against the Brouillettes' motion for a directed verdict, which was over a month after Swenson testified during his case-in-chief. In fact, when Swenson testified during his case-in-chief, his attorney specifically stated that Swenson had raised two claims: he was entitled to a prescriptive easement, and he was entitled to an easement by necessity. When Swenson's attorney first advanced his new appurtenant-easement theory, the Brouillettes' attorney promptly objected and argued that his clients had no notice of that claim. It is understandable that the Brouillettes' attorney did not object when Swenson testified that he thought he acquired an easement when he bought the property. That

9

testimony conflicted with Swenson's claim that he was entitled to a prescriptive easement. We find that Swenson did not properly raise an appurtenant-easement theory, and the issue was not tried with the Brouillettes' consent. Therefore, this issue was not properly before the chancellor. There is no merit to this issue.

## II. PRESCRIPTIVE EASEMENT

¶24. Next, Swenson claims that the chancellor should have found that he acquired a prescriptive easement over the road. "The . . . burden of proof needed to establish a prescriptive easement is the same as for a claim of adverse possession of land." *Evanna Plantation Inc. v. Thomas*, 999 So. 2d 442, 447 (¶17) (Miss. Ct. App. 2009). "To acquire a prescriptive easement the claimant must show that the possession was: (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years." *Id*. "The person claiming the possession has the burden of proving each of these elements by clear and convincing evidence." *Id*.

¶25. James testified that he permitted Swenson's use of the private road. Although he put a lock on the gate, he gave Swenson a key. James also testified that when Swenson lost the key, he gave Swenson another one. According to James, he was simply being a "good neighbor" when he allowed Swenson to use the private road. Swenson disputed that James had given him a key to the lock. According to Swenson, he cut off James's lock and replaced it with a combination lock.

¶26. It was the chancellor's place to weigh James's and Swenson's testimonies. The chancellor could have justifiably found that James had given Swenson the keys to the lock. Even if Swenson's testimony is taken as true that James did not give him keys to the lock,

10

James could have still permitted Swenson's placement of the combination lock.

¶27. As previously mentioned, the chancellor did not abuse his discretion when he found that James allowed Swenson to use the private road. Because Swenson was a permissive user, he could not demonstrate the "hostility" element necessary to present a prima facie case that he had a prescriptive easement. Therefore, there is no merit to this issue.

### III. EASEMENT BY NECESSITY

¶28. Finally, Swenson argues that the chancellor erred by denying his claim for an easement by necessity. "An easement by necessity arises by implied grant when a part of a commonly[]owned tract of land is severed in such a way that either portion of the property has been rendered inaccessible except by passing over the other portion or by trespassing on the lands of another." *Harkness*, 58 So. 3d at 706 (¶8) (quoting *Broadhead*, 611 So. 2d at 953). "The concept regarding an easement by necessity is based upon 'the implication that someone who owned a large tract would not intend to create inaccessible smaller parcels.'" *Id*.

> To demonstrate a prima facie case for an easement by necessity, a claimant must prove that (1) the dominant and servient parcels were once under common ownership, (2) severance by the common owner(s), (3) the necessity for the easement arose at the time of the severance by the common owner(s), and (4) the necessity is continuing.

*Id*. Swenson sought an easement involving a "way of necessity." *See id*. (distinguishing two types of easements by necessity – those involving "ways of necessity" from those "involving matters that may be highly convenient or essential to the full enjoyment of the land"). A plaintiff "must prove strict necessity to obtain an implied easement involving a 'way of necessity.'" *Id*.

11

¶29. The chancellor found that Swenson was not entitled to an easement by necessity because he had alternative means to access the twenty-eight acres. We find that the chancellor acted within his discretion. There was testimony that Swenson could access the twenty-eight acres by way of a public road called "Fox Run South." Additionally, Swenson and others testified that he could access the twenty-eight acres by driving over a dam that separated his ponds. According to Swenson, he could not drive heavy equipment over the dam, and he could only drive over the dam if it had not rained recently. However, there was evidence that he drove a heavy tractor over the dam nearly contemporaneously with the trial. In *Evanna Plantation*, 999 So. 2d at 447 (¶16), this Court held that, because there was insufficient proof that a bridge was the sole means to access property; there was no testimony regarding the expense involved with crossing a body of water; and there was no testimony as to the value of the property to be accessed, the chancellor did not err when he declined to award an easement by necessity. Similarly, there was no testimony regarding what it would cost Swenson to access his property over the dam. "Where one seeks to obtain a 'way of access' easement by necessity but submits no evidence as to the allegedly higher costs of an alternative route, a trial court will not err in declining to award an easement." *Harkness*, 58 So. 3d at 708 (¶14). "Simply stating that it would appear to be 'very expensive' to access property by some other means is not sufficient." *Id*. There is no merit to this issue.

¶30. **THE JUDGMENT OF THE PEARL RIVER COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.**