# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2015-CA-01875-COA

| | |
|---|---|
| **JOHN WILLIAM MAYTON, J.A. MCNEIL, AND MICHAEL MARANTO, JR.** | **APPELLANTS/CROSS-APPELLEES** |

v.

| | |
|---|---|
| **JANE OLIVER** | **APPELLEE/CROSS-APPELLANT** |

| | |
|---|---|
| DATE OF JUDGMENT: | 11/19/2015 |
| TRIAL JUDGE: | HON. MARIE WILSON |
| COURT FROM WHICH APPEALED: | WASHINGTON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANTS: | PHILIP MANSOUR JR. |
| ATTORNEY FOR APPELLEE: | LAWRENCE DOUGLAS WADE JR. |
| NATURE OF THE CASE: | CIVIL - REAL PROPERTY |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED; ON CROSS APPEAL: AFFIRMED – 11/30/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WILSON, J., FOR THE COURT:**

¶1.     This is a case about four neighbors on a cul-de-sac in Greenville.  Three of them, the plaintiffs, allege that the other, Jane Oliver, violated a restrictive covenant and interfered with express or prescriptive drainage easements when she blocked a PVC pipe that emptied water from their lots onto her property.  The chancellor found that the plaintiffs failed to establish the existence of an express or prescriptive drainage easement and denied their claims for injunctive relief and damages.  The chancellor also denied Oliver's request for attorney's fees and her counterclaim for damages.  The plaintiffs appealed, and Oliver cross-appealed.  We find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     The Orchard Plantation Subdivision in Greenville was established in 1978. The approximately ten-acre subdivision was divided into seven lots along Orchard Place, a private road that winds south off of Tampa Drive before dead-ending in a cul-de-sac. The Washington County Board of Supervisors approved the subdivision's plat and "Drainage Plan," and both were recorded in the county land records. The subdivision's "Declaration of Protective Covenants and Restrictions" was also recorded in the county land records.

¶3.     All but one of the subdivision's current property owners are parties to this case. Defendant Oliver bought her home on Lot 5 in 1987. Lot 5 is at the south end of Orchard Place in the cul-de-sac. Plaintiff J.A. McNeil bought Lot 6 in 1981 and built a home on it in 1986. McNeil's home is north of Oliver's on the east side of Orchard Place. McNeil also owns two other lots in the subdivision that are not directly at issue in this case. In 2010, plaintiff Michael Maranto purchased the home on Lot 4, which is adjacent to and essentially due west of Oliver's home. In 2013, plaintiff John William Mayton purchased the home on Lot 3, which is north of Maranto's lot and northwest of Oliver's lot on the west side of Orchard Place. Mayton bought his home out of foreclosure after it had been vacant for about two years.

¶4.     In the spring of 2014, Greenville experienced several consecutive days of heavy rain. Oliver testified that her yard flooded all the way up to the top step of her porch, almost inside her house. Oliver concluded that the flooding was caused or exacerbated by water flowing into a culvert that runs under her driveway in front of her house and—in particular—by a six-

inch PVC pipe that runs under the street from Mayton's house (Lot 3)[1] and then empties into Oliver's culvert. Oliver testified that she had never noticed the PVC pipe prior to the heavy rain and flooding in the spring of 2014. But on that occasion, water was flowing from the pipe "like a fountain . . . into [her] yard in a huge rush." To address the problem as she perceived it, Oliver blocked her culvert and plugged the end of the PVC pipe using plywood and bags of unmixed concrete. According to Oliver, this alleviated her problems.

¶5. However, the plaintiffs claim that Oliver's actions made their drainage problems much worse. The PVC pipe ran beneath Orchard Place in a southeasterly direction from Mayton's yard to Oliver's culvert. The pipe had been draining water from Mayton's yard and runoff from the northeast part of Maranto's yard into Oliver's culvert. Mayton and Maranto testified that by blocking the PVC pipe, Oliver caused water to back up into their yards, which led to several weeks of standing water and significant damage to their lawns.

¶6. McNeil testified that water from his yard previously drained into Oliver's culvert. He also testified that Oliver had directed the natural flow of water from his yard toward her culvert when she built a "berm" along their property line in the 1990s. McNeil claimed that by blocking the culvert, Oliver caused water to back up into his yard, which caused several weeks of standing water and significant damage to his lawn. Oliver generally disputed her neighbors' claims and denied that their drainage issues were any worse than before.

¶7. On June 10, 2014, Mayton, McNeil, and Maranto filed a complaint against Oliver in

---

[1] There is some ambiguity in the record as to whether the beginning point of the PVC pipe is on Mayton's lot or Maranto's lot (Lot 4). However, the ambiguity is not material to any of the issues in this appeal. As explained below, the pipe drains both lots, and both Mayton and Maranto claim it as a drainage easement.

the Washington County Chancery Court. They alleged that Oliver was in violation of the subdivision's restrictive covenants, that they were entitled to use "utility easements" shown on the subdivision's plat to drain their respective lots, and that the subdivision's "current drainage pattern [was] consistent with the [subdivision's] original Drainage Plan," which they attached as an exhibit to the complaint. The plaintiffs sought preliminary and permanent injunctive relief and damages based on Oliver's alleged violation of the covenants and interference with the easements.

¶8. Oliver answered, denied the plaintiffs' allegations, and filed a counterclaim. She alleged that the plaintiffs' use of the PVC pipe to divert water from their lots onto her property violated the subdivision's restrictive covenants and Drainage Plan. She also alleged that Mayton had added "fill dirt" to his property, which had altered the neighborhood's drainage pattern and Drainage Plan. Oliver further alleged that the plaintiffs' actions and the resulting drainage onto her property had caused damage to her yard and driveway, and she sought injunctive relief (removal of the PVC pipe) and damages.

¶9. On July 15 and 17, 2014, the chancellor held a hearing on the plaintiffs' request for a preliminary injunction. At the hearing, an engineer hired by the plaintiffs, Marcus Hooker Jr., had to concede that the plaintiffs' claims—and the neighborhood's current drainage pattern—were *not* consistent with the subdivision's Drainage Plan. Among other things, the drainage from Mayton's and Maranto's lots through the PVC pipe and into Oliver's culvert was directly contrary to the flow of water depicted on the Drainage Plan. In fact, the Drainage Plan showed that water should drain *west* off of Mayton's lot, *away* from Oliver's

4

lot. The Drainage Plan called for a "swale" on Mayton's lot to direct drainage to the west; however, Hooker testified that the swale did not exist at the time he inspected the property. Hooker conceded that drainage from the Mayton lot was "actually going in exactly the opposite way from the Drainage Plan," while drainage on the Oliver lot was substantially consistent with the Drainage Plan.

¶10.    The Drainage Plan did call for a twenty-four-inch "cross drain" under the street, somewhat to the north of the actual path of the PVC pipe. However, the Drainage Plan called for the cross drain to carry water west from McNeil's lot across the street to Mayton's lot, where it would then continue to drain west off the back of Mayton's lot. In other words, the PVC pipe was draining water in roughly the *opposite* direction of the cross drain depicted on the Drainage Plan. There is no evidence that such a cross drain was ever installed.

¶11.    McNeil testified that a prior owner of the Mayton lot (Lot 3), Tom Cameron, installed the PVC pipe in December 2007. According to McNeil, the PVC pipe replaced an old metal pipe that had been in the same location since at least 1981. McNeil testified that he and Cameron agreed that the metal pipe should be replaced because it had become "compressed" or "clogged" or "crushed," which had "retarded the flow of water from one side to the other." McNeil discussed the new PVC pipe with all of the subdivision's residents *except* Oliver and her husband, which he considered a sufficient consultation with the subdivision's "board." He testified that this gave him "a majority" of votes to put in the PVC pipe "since [he has] three lots and three votes." McNeil testified that he did not tell the Olivers about the new pipe because "[t]hey don't agree to anything." As noted above, Oliver testified that she was

5

unaware of the PVC pipe emptying into her culvert prior to the heavy rains and flooding in the spring of 2014. She also testified that she was not aware of the prior metal pipe.

¶12. Mayton testified that his house had been vacant for two years before he bought it out of foreclosure in 2013. There was a problem with standing water in his yard because the PVC pipe was not draining properly. Mayton testified that he had the pipe cleaned out, which resolved the problem. McNeil also testified that Leroy Davenport, who owned Lot 3 before Tom Cameron, "was not real good about cleaning out the [PVC pipe]," which resulted in the pipe not draining properly for periods of time and standing water on Lot 3.

¶13. The Drainage Plan provided that the runoff from Maranto's lot (Lot 4) should drain primarily to the west along the "swale" on Mayton's property. The Plan provided that the remainder of the runoff from his property would drain south down the Maranto/Oliver property line into a "catch basin" and eventually into what was referred to as "Ditch Number Seven" or "Number Seven Drainage Canal," which is located to the south of Oliver's property. Drainage along the Maranto/Oliver property line into the catch basin has not been impeded and does not appear to be at issue in this litigation. As noted above, the Drainage Plan does not call for any drainage from the Maranto lot via the disputed PVC pipe.

¶14. Oliver testified that in the 1990s her house flooded with approximately eighteen inches of water throughout. She did not believe that any of the other houses on her street experienced similar flooding. To avoid future flooding, she resolved to improve the drainage on her property, and she had a system of "catch basins" constructed. She added to the system as time went by, and she testified that there were approximately ten such catch basins on her

6

lot at the time of trial. These basins drain into a "slough" behind her property and eventually into the drainage ditch or canal to the south. Oliver testified that she spent about $10,000 on the first basins she installed in the 1990s and had incurred additional costs as she added to her drainage system. Oliver objected to her neighbors draining their lots onto her property and overloading her drainage system. Oliver denied that she had exacerbated her neighbors' drainage issues by blocking her culvert or the PVC pipe. Oliver also claimed that Mayton had exacerbated drainage problems in the cul-de-sac by putting in a pool and elevating parts of his lot with fill dirt.

¶15. The recorded plat for the subdivision was admitted into evidence in the chancery court. The plat shows two twenty-five foot "utility easements" along the path of the planned private road in the subdivision. As constructed, the road appears to occupy about half of the combined width of the utility easements. The plat does not provide any further description of the purpose or permissible uses of the "utility easements."

¶16. The warranty deed conveying Lot 5 to Oliver and her husband was also admitted into evidence. Although Oliver testified that she was unaware of the subdivision's restrictive covenants, the deed states that the "conveyance [was] subject to all rights of way and easements of record, as well as the protective covenants of record in Book 1396 at page 623 of [the Washington County] land records." As relevant to this litigation, the referenced "Declaration of Protective Covenants and Restrictions" states as follows: "Easements reserved for drainage and utility purposes, as shown upon the plat filed herewith or any other instrument of record, shall remain unobstructed."

7

¶17. There was also some evidence introduced of two five-foot drainage easements along what is at present the Oliver/Maranto (Lot 5/Lot 4) property line. A 1980 survey showing the drainage easements was attached to and recorded with a 1980 deed. The two five-foot drainage easements were also shown on a survey attached to a 2006 deed in which Oliver and her husband conveyed Lot 5 from a "family trust" to themselves. The five-foot easements are along the Oliver/Maranto property line, some distance to the south and west of the endpoint of the disputed PVC pipe.

¶18. On July 25, 2014, the chancellor entered an order granting the plaintiffs' request for a preliminary injunction. In her order, the chancellor stated that an "application for a preliminary injunction is a matter committed to the [chancellor's] sound discretion," and she found that "on a balancing of the [four] factors" relevant to such an application,[2] the plaintiffs' request should be granted. Therefore, the chancellor ordered Oliver to remove all obstructions to the culvert and PVC pipe pending a final hearing on a permanent injunction.

¶19. In August 2015, the court held a final hearing on the plaintiffs' claims for permanent injunctive relief and damages and Oliver's counterclaim for damages. The chancellor received additional testimony from the parties and then permitted the parties to submit proposed findings of fact and conclusions of law. The record does not include the plaintiffs' proposed findings and conclusions, but it does include Oliver's.

¶20. On November 19, 2015, the chancellor entered an opinion and final judgment denying the plaintiffs' claims for permanent injunctive relief and damages and denying Oliver's

---

[2] *See, e.g., Am. Elec. v. Singaryar*, 530 So. 2d 1319, 1324 (Miss. 1988).

counterclaim for damages and request for attorney's fees. The chancellor found that the plaintiffs failed to prove an express or prescriptive drainage easement. The chancellor also found that the plaintiffs' claims were not supported by the subdivision's recorded Drainage Plan and that the plaintiffs were not entitled to relief based on Oliver's alleged violation of the subdivision's restrictive covenants. On Oliver's counterclaim, the chancellor found that Oliver failed to prove that the alleged damages to her driveway in the amount of $79,185.50 were the plaintiffs' fault rather than just the "natural result of the shifting ground that we all routinely experience in the Delta." The plaintiffs appealed, and Oliver cross-appealed.

**ANALYSIS**

¶21. On appeal, the plaintiffs argue that the chancellor erred by denying their claims for injunctive relief and damages and, specifically, that the chancellor erred when she found that they failed to prove express drainage easements, prescriptive drainage easements, or an actionable violation of the subdivision's restrictive covenants. On cross-appeal, Oliver argues that the chancellor erred by denying her request for her attorney's fees. She contends that she was entitled to an award of attorney's fees because she was wrongfully enjoined by the chancery court's order granting a preliminary injunction. We address these issues in turn, we find no error, and we affirm the judgment of the chancery court in its entirety.[3]

## I.    Express Drainage Easements

¶22. Mississippi law recognizes express, implied, and prescriptive easements. *Favre v.*

---

[3] The parties' pleadings, arguments, and evidence in the chancery court did not rely on or address the general common-law principles governing the duties and rights of "upper" and "lower" landowners. *See generally Hall v. Wood*, 443 So. 2d 834, 838-40 (Miss. 1983). Therefore, our decision does not address these principles.

*Jourdan River Estates*, 148 So. 3d 361, 368 (¶20) (Miss. 2014). The plaintiffs in this case first contend that they are entitled to injunctive relief and damages based on express drainage easements. The existence or nonexistence, nature, and extent of an express easement are "determined by the language of the deed [or other instrument], taken in connection with the circumstances existing at the time of making it." *Id.* "Descriptions of easements may be fairly general," but they must be accurate and clear. *Id.*

¶23. "[T]o determine what the parties intended, this Court must first examine the language contained in the 'four corners' of the instrument." *Warren v. Derivaux*, 996 So. 2d 729, 735 (¶12) (Miss. 2008). We "construe the language in a manner which makes sense to an intelligent layman familiar only with the basics of English language." *Id.* (quotation marks omitted). If the parties' intent is not clear from the "four corners" of the instrument, we "will employ any applicable canons of contract construction." *Id.* at (¶14). "One such canon . . . is that great weight should be given to practical construction which the parties have placed upon the instrument." *Id.* (quotation marks omitted).

¶24. "In construing the language of an easement, the rules for the interpretation of deeds and other written instruments apply." *Hobgood v. Koch Pipeline Se. Inc.*, 769 So. 2d 838, 843 (¶24) (Miss. Ct. App. 2000); *accord Warren*, 996 So. 2d at 735 (¶12). "Whether [an instrument] is ambiguous is a question of law which we review de novo." *Crisler v. Crisler*, 963 So. 2d 1248, 1251 (¶5) (Miss. Ct. App. 2007) (citing *Tupelo Redevelopment Agency v. Abernathy*, 913 So. 2d 278, 283 (¶12) (Miss. 2005)). However, "[i]f an ambiguity is found to exist, its interpretation is a matter for the trier of fact which we review under a substantial

evidence/manifest error standard." *Id.*; *cf. Epperson v. SOUTHBank*, 93 So. 3d 10, 17 (¶20) (Miss. 2012) (holding that if a contract is "ambiguous or subject to more than one interpretation, the case must be submitted to the trier of fact, and summary judgment is not appropriate"). Therefore, if there is an ambiguity as to existence of the express drainage easement claimed by the plaintiffs, the chancellor's ruling becomes a question of fact.

¶25. In *Warren*, *supra*, the "pivotal question" was whether a "Reciprocal Easement" between Warren and Smith "establishe[d] a perpetual easement for parking and signage in addition to [an] easement for ingress and egress." *Id.* at 732 (¶1). The instrument at issue was "entitled 'Reciprocal Easement'" and granted an "Easement" for "ingress and egress." *Id.* at 733 (¶3). It also provided: "parties with business interest [with Smith] may cross-park in four spaces owned by W.W. Warren." *Id.* at 733 (¶3). Finally, the document granted Smith a "legal right" to have "a business sign as mutually agreed upon" at a specific location on Warren's property.

¶26. A dispute later arose as to whether the "Reciprocal Easement" "created a perpetual easement as to parking and signage" or "mere" revocable "privileges as to the parking and signage." *Id.* at 733-35 (¶¶5, 11). The Supreme Court held that the reciprocal easement was not accurate and clear on these issues. *See id.* at 736 (¶16). However, the Court applied "the general rule . . . that where the grant is in general terms, the exercise of the right, with the acquiescence of both parties, in a particular course or manner, fixes the right and limits it to the particular course or manner in which it has been enjoyed." *Id.* And the evidence in that case indicated that the parties and their successors had treated parking and signage as rights,

11

not mere privileges. *See id.* at (¶¶16, 18). The Court also relied on the rule that "[a]ny ambiguity . . . should be construed against the drafting party" (Warren). *Id.* at (¶17).

¶27. Relying on *Warren*, the plaintiffs here argue that the twenty-five foot "utility easements" shown in the original subdivision plat should be construed as *drainage* easements because of their historical "use for drainage and acquiescence by [Oliver]." The chancellor, however, concluded that the "utility easements" could not be so broadened as to permit the plaintiffs to all drain their respective lots through and across Oliver's property. The chancellor reasoned that the express terms of the subdivision plat did not authorize use of the utility easements for drainage. The chancellor also reasoned that the contemporaneous subdivision Drainage Plan clearly did not contemplate use of the utility easements for drainage in the manner or direction urged by the plaintiffs.

¶28. We find no error in the chancellor's ruling on this issue. In *Warren*, the parties' "Reciprocal Easement" expressly authorized the use of four parking spots and the placement of a sign in a specific location on the servient estate. In that case, the plaintiff relied on the parties' subsequent "practical construction" of the easement and Warren's "acquiescence" only (1) to clarify and resolve any ambiguity as to whether the express provisions for parking and signage were true easements or "mere" revocable "privileges" and (2) to determine which four parking spaces he could use. *See Warren*, 996 So. 2d at 733-36 (¶¶3-5, 11-18). The *Warren* Court also relied on the rule that ambiguities should be resolved against the drafter, which in that case favored recognition of the easements. *See id.* at 736 (¶17).

¶29. The issues in this case are materially different. None of the parties to this litigation

12

drafted the subdivision plat. More important, the plat depicts easements that are described only as "utility easements." The plat provides no further elaboration of the easements' purposes or permissible uses. The plaintiffs argue that an alleged history of use and acquiescence has transformed these utility easements into significant drainage easements. Indeed, the plaintiffs seek to transform the utility easements into a legal right to impose a drainage pattern that is *directly contrary to* the subdivision's Drainage Plan—which was recorded *contemporaneously* with the plat. *Warren* recognizes that subsequent use of an easement may serve to clarify the "course, manner, extent, and length" of an express easement grant. *Id.* at 736 (¶16). However, the Supreme Court did not hold that use of the easement can materially change the permissible uses of the easement.

¶30.    Neither the subdivision plat nor any other document in evidence unambiguously establishes the drainage easement claimed by the plaintiffs in this case.[4] In addition, the chancellor did not manifestly err in finding that the plaintiffs failed to established such an easement through extrinsic evidence. Therefore, we affirm the chancellor's ruling that the plaintiffs failed to prove an express drainage easement.

## II.    Prescriptive Drainage Easements

¶31.    The plaintiffs also argue that they proved a prescriptive easement to use the PVC pipe to drain water from their lots onto Oliver's property. However, the plaintiffs' complaint did

---

[4] The plaintiffs' reliance on the two five-foot drainage easements shown on some surveys near Lot 5/Lot 4 property line is also misplaced. Those drainage easements are not in the same area as the disputed PVC pipe. In fact, those easements appear to be consistent with drainage from the Maranto lot (Lot 4), which remains unobstructed and is not at issue in this appeal. *See supra* ¶13.

13

not assert a claim for a prescriptive easement. Nor did the plaintiffs raise the issue at either hearing in the chancery court. The first mention of a prescriptive easement was in Oliver's proposed findings of fact and conclusions of law, which asked the chancellor to find that the plaintiffs failed to prove a prescriptive easement. In the final judgment, the chancellor found that the plaintiffs failed to prove a prescriptive easement, and the plaintiffs challenge the chancellor's finding on appeal. Although it is not entirely clear that the plaintiffs properly raised this issue in the trial court, Oliver does not argue that the issue is waived and addresses it on the merits. Therefore, we will also address the issue. *See Fortner v. Specialty Contracting LLC*, 217 So. 3d 736, 746 (¶31) (Miss. Ct. App. 2017) ("[A] party can waive a waiver argument by not making the argument below or in its briefs [on appeal]." (quoting *Freeman v. Pittsburgh Glass Works LLC*, 709 F.3d 240, 250 (3d Cir. 2013)).

¶32. "The standard and burden of proof to establish a prescriptive easement is the same as a claim of adverse possession of land." *Thornhill v. Caroline Hunt Tr. Estate*, 594 So. 2d 1150, 1152 (Miss. 1992). "[T]o establish adverse possession or a prescriptive easement here, the [plaintiffs] must show that the possession was: (1) under claim of ownership; (2) actual or hostile; (3) open, notorious, and visible; (4) continuous and uninterrupted for a period of ten years; (5) exclusive; and (6) peaceful." *Id.* at 1152-53 (quotation marks omitted). "These elements must be proven by clear and convincing evidence." *Id.* at 1153. "Clear and convincing evidence is such a high standard of proof that even the overwhelming weight of the evidence does not rise to the same level." *Massey v. Lambert*, 84 So. 3d 846, 848 (¶7) (Miss. Ct. App. 2012) (alterations, quotation marks omitted).

¶33. A chancellor's "finding that the proof was insufficient to sustain a claim of adverse possession"—or, in this case, a prescriptive easement—"is a fact-finding that requires our application of the substantial evidence/manifest error test." *Dean v. Slade*, 63 So. 3d 1230, 1235 (¶21) (Miss. Ct. App. 2010). "It requires little familiarity with the institutional structure of our judicial system to know that this Court does not sit to redetermine questions of fact." *Johnson v. Black*, 469 So. 2d 88, 90 (Miss. 1985). "The chancellor is the finder of fact, and the assessment of witness credibility lies within his sole province." *Darnell v. Darnell*, No. 2015-CA-00764-SCT, 2017 WL 4837643, at *2 (¶8) (Miss. Oct. 26, 2017) (quotation marks omitted); *accord Irle v. Foster*, 175 So. 3d 1232, 1237 (¶32) (Miss. 2015) (holding that the "power" to "judge[] the credibility of the witnesses" "lies with [the chancellor] alone"). "This Court gives deference to a chancellor's findings in regard to witness testimony, because the chancellor is able to observe and personally evaluate the witnesses' testimony and the parties' behavior." *McNeese v. McNeese*, 119 So. 3d 264, 275 (¶32) (Miss. 2013) (quotation marks omitted). It is also "for the chancellor to determine the . . . weight of the evidence." *Powell v. Ayars*, 792 So. 2d 240, 243 (¶6) (Miss. 2001).

¶34. Therefore, when "there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008) (quotation marks omitted). "This Court will not substitute its judgment for that of the chancellor even if this Court disagrees with the lower court on the finding of fact and might arrive at a different conclusion."

15

*Sanderson v. Sanderson*, 170 So. 3d 430, 434 (¶13) (Miss. 2014) (alterations, quotation marks omitted).

¶35. In this case, the chancellor found that the plaintiffs failed to meet their burden to prove at least two elements of a prescriptive easement: possession that was (1) "open, notorious, and visible" and (2) "continuous and uninterrupted for a period of ten years." Therefore, on appeal, this Court is limited to determining whether the chancellor committed *manifest error* when she found that the plaintiffs failed to prove these facts *by clear and convincing evidence*. Moreover, in addressing this question, this Court is not permitted to reweigh or reinterpret the evidence or reevaluate the credibility of the witnesses.

¶36. In light of the plaintiffs' high burden of proof, the conflicting evidence presented, and our limited standard of review, we must affirm the chancellor's judgment on this issue. The chancellor visited the property and saw the PVC pipe at issue. The pipe visibly protrudes only a short distance into the culvert that runs under Oliver's driveway. The chancellor found that the direction and source of any water that travels through the pipe are not visible or apparent from its endpoint in Oliver's culvert. Also, there is no evidence that water regularly or frequently flowed through the pipe. The evidence seems to suggest that only very heavy rains would have produced any significant flow of water through the pipe. In addition, McNeil testified that there were periods of time that the pipe was clogged or crushed such that no water would have flowed through it. Oliver testified that she did not even notice the pipe until just before this lawsuit was filed. And McNeil pointedly testified that no one consulted or notified Oliver when the old metal pipe was replaced with the PVC

16

pipe. On this evidence, the chancellor did not manifestly err by finding that the plaintiffs' use of the PVC pipe failed to establish an "open, notorious, and visible" drainage easement by clear and convincing evidence.

¶37. Nor did the chancellor manifestly err in finding that the plaintiffs failed to prove ten years of "continuous and uninterrupted possession." The chancellor's finding on this issue was consistent with McNeil's own testimony that there were various periods of time that the pipe was clogged or crushed so that water did not drain through the pipe. Therefore, we cannot say that the chancellor clearly erred in finding that the plaintiffs failed to prove this element of their claim by clear and convincing evidence.

¶38. Because the chancellor found that the plaintiffs failed to prove two elements of a prescriptive easement, and because the chancellor's findings are not clearly or manifestly erroneous, we affirm the chancellor's ruling that the plaintiffs never acquired a drainage easement by prescription.

### III. Restrictive Covenants

¶39. The chancellor ruled that Oliver was bound by the subdivision's restrictive covenants and that Oliver was in violation of a covenant prohibiting homeowners from obstructing easements; however, the chancellor then ruled that Oliver had violated the covenant only because "alterations" to the subdivision's Drainage Plan "caused an excess amount of water to flow upon [Oliver's] property." The chancellor ruled that this provided Oliver with "a defense to her violation of the restrictive covenant" because the alterations to the Drainage Plan did not comply with the statutory procedure for altering a recorded plat. *See* Miss. Code

17

Ann. § 17-1-23(4) (Rev. 2012); Miss. Code Ann. § 19-27-31 (Rev. 2012).

¶40.    On appeal, the plaintiffs argue that the chancellor erred in denying them injunctive relief based on Oliver's alleged violation of the restrictive covenant. They argue, among other things, that they were not required to petition for an alteration to the Drainage Plan and that the chancellor erred in treating their failure to file such a petition as a "defense" to Oliver's violation of the covenant. We affirm the denial of injunctive relief on this issue, albeit for a different reason. *See Brocato v. Miss. Publishers Corp.*, 503 So. 2d 241, 244 (Miss. 1987) (holding that an appellate court may affirm for any reason sufficient to sustain the judgment and is not limited to the reasons given by the lower court).

¶41.    The subdivision's "Declaration of Protective Covenants and Restrictions" was recorded, and Oliver's deed specifically referenced it by book and page number. Although Oliver testified that she did not know about the covenants, there is no question that she was bound by them. *See, e.g.*, *Perry v. Bridgetown Cmty. Ass'n Inc.*, 486 So. 2d 1230, 1234 (Miss. 1986). She does not argue otherwise on appeal.

¶42.    However, our affirmance of the chancellor's rulings that the plaintiffs do not possess express or prescriptive drainage easements inescapably leads to the further conclusion that Oliver was not in violation of the relevant covenant. The plaintiffs rely on a covenant that states: "Easements for drainage and utility purposes, as shown upon the plat filed herewith or upon any other instrument of record, shall remain unobstructed." The chancellor found, and we have affirmed, that the plaintiffs do not possess an express or prescriptive easement to drain water off of their lots and into Oliver's culvert via the PVC pipe. That being the

18

case, Oliver simply did not violate the above-quoted covenant by obstructing the PVC pipe or her culvert. The pipe and culvert were in a "utility easement," but—as the chancellor found and we affirm—the utility easement did not grant the plaintiffs any drainage rights, and Oliver did nothing to obstruct or prevent its use as a utility easement.

¶43. It was the plaintiffs who first injected the issue of the Drainage Plan into the case when they alleged in their complaint that "[t]he current drainage pattern [in the cul-de-sac] is consistent with the [subdivision's] original Drainage Plan." This allegation turned out to be wrong. The evidence is clear that the present drainage pattern in the cul-de-sac bears little resemblance to the recorded Drainage Plan. The drainage on Oliver's lot is substantially consistent with the Plan, but most of the runoff from the plaintiffs' lots is directly contrary to the Plan. On appeal, the parties have debated whether the plaintiffs or their predecessors were required to file a petition to alter the recorded Drainage Plan.[5] They have also debated whether the chancellor erred by treating the absence of such a petition as a "defense" to a violation of the subdivision's restrictive covenants. But for the reasons discussed above, it is unnecessary to address these issues. It is sufficient to say: (1) given the chancellor's findings that the plaintiffs do not possess a drainage easement into Oliver's culvert via the PVC pipe, Oliver simply was not in violation of the covenants; (2) the plaintiffs clearly are not entitled to any *relief* under the Drainage Plan, as what they seek is contrary to the Plan;

---

[5] *See* Miss. Code Ann. §§ 17-1-23(4) & 19-27-31; *COR Devs. LLC v. Coll. Hill Heights Homeowners LLC*, 973 So. 2d 273, 282-88 (¶¶22-36) (Miss. Ct. App. 2008) (discussing sections 17-1-23(4) and 19-27-31); Miss. Att'y Gen. Op. No. 2002-0254, 2002 WL 1380961, at *2 (May 17, 2002) (opining "that Section 19-27-31 sets out the procedure to change a subdivision plat" but "does not dictate when or under what circumstances a plat must be changed").

and (3) for purposes of this appeal, this Court has not treated the Drainage Plan or the statute as a "defense" to any of the plaintiffs' claims.

## IV. Plaintiffs' Claims for Damages and Injunctive Relief

¶44. Because the plaintiffs did not establish an express or prescriptive easement or a violation of the restrictive covenant, it follows that they are not entitled to injunctive relief or damages. *See Miss. High. Sch. Activities Ass'n v. Hattiesburg High Sch.*, 178 So. 3d 1208, 1213 (¶22) (Miss. 2015) ("*an application for injunctive relief must be predicated on some legal or equitable claim*"); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1127 (11th Cir. 2005) ("[A]ny . . . suit for . . . a . . . permanent injunction must be based upon a cause of action . . . . There is no such thing as a suit for a traditional injunction in the abstract." (quotation marks omitted)).

## V. Oliver's Request for Attorney's Fees

¶45. On cross-appeal, Oliver argues that the chancellor erred by denying her request for attorney's fees. She argues that she is entitled to attorney's fees as a matter of law because she was wrongfully enjoined. *See* M.R.C.P. 65(c).[6] In denying Oliver's motion, the chancellor cited *Rice Researcher Inc. v. Hiter*, 512 So. 2d 1259 (Miss. 1987), in which our Supreme Court summarized its precedents on this issue as follows:

> If the relief sought is for an injunction alone, attorneys fees for dissolution must be allowed. However, where the prayer for injunction is ancillary to the main relief sought and the entire case is heard finally, and not separately on

---

[6] On appeal, Oliver emphasizes that the plaintiffs' complaint was based in part on the plaintiffs' false assertion that they were in compliance with the subdivision's recorded Drainage Plan. However, that assertion was shown to be false at the preliminary injunction hearing and therefore was not the basis for the preliminary injunction.

any preliminary motion to dissolve, attorneys fees should not be allowed. But, where the entire relief sought is controlled by the injunction, attorneys fees are allowable, even though there is no preliminary motion to dissolve the injunction and the injunction is not dissolved until the final hearing on the merits. . . . Properly understood, the rule is that, where injunctive relief is the primary remedy sought, fees and expense award follow dissolution of preliminary injunctive relief.

*Id.* at 1270-71 (citations, paragraph break omitted).

¶46. We affirm the chancellor's denial of Oliver's request for attorney's fees in light of the claims that were asserted in this case. All three plaintiffs asserted claims for substantial compensatory damages based on alleged damage to their lawn and resulting costs, and all three also introduced evidence at the final hearing to support their claims. As noted above, Oliver also asserted a counterclaim for $79,185.50 in alleged damages to her driveway, and she too presented evidence on her claim at the final hearing. Oliver also sought injunctive relief. Thus, the plaintiffs did not seek "an injunction alone," and we cannot say that an injunction was "the primary remedy sought" in this case. *Id.* We also note that there was no "preliminary motion to dissolve" the preliminary injunction; it simply terminated with the final judgment, after the conclusion of the hearing on the merits. In these circumstances, we cannot say that the chancellor erred by denying Oliver's request for attorney's fees. *Id.*

## CONCLUSION

¶47. On direct appeal, we affirm the chancellor's findings that the plaintiffs failed to establish an express or prescriptive drainage easement. Therefore, we also affirm the chancellor's denial of the plaintiffs' claims for damages and injunctive relief. On cross-appeal, we hold that the chancellor did not err by denying Oliver's request for attorney's fees.

21

Therefore, we affirm the judgment of the chancery court in its entirety.

¶48.    **ON DIRECT APPEAL: AFFIRMED.  ON CROSS APPEAL: AFFIRMED.**

**GRIFFIS, P.J., CARLTON, FAIR, WESTBROOKS AND TINDELL, JJ., CONCUR.  GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, C.J., IRVING, P.J., AND BARNES, J.**

**GREENLEE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶49.    I concur with the majority opinion that the plaintiffs were not entitled to express drainage easements, and they were not required to proceed under either statutory mechanism regarding amendment of a subdivision plat.  But dissenting, I would find that the chancellor manifestly erred when she concluded that Mayton and Maranto had failed to present clear and convincing evidence that their use of the PVC pipe and Oliver's culvert were open, notorious, and visible, and uninterrupted for at least ten years.[7]  Consequently, I would remand the case to the chancellor so she could determine whether Mayton and Maranto had satisfied their burden of proof regarding the remaining prescriptive-easement elements.

¶50.    Although relatively uncommon, prescriptive drainage rights are not unprecedented in Mississippi.  *See Lauck v. Gilbert*, 252 Miss. 371, 395, 173 So. 2d 626, 638 (1965); *Pompey Lake Drainage Dist. v. McKinney Lake Drainage Dist.*, 136 Miss. 168, 177, 99 So. 387, 389 (1924); *Fratesi v. City of Indianola*, 972 So. 2d 38, 43 (¶12) (Miss. Ct. App. 2008).  The first time "prescriptive easement" appears in the record is in Oliver's proposed findings

_____

[7] On appeal, the plaintiffs have not claimed that the chancellor erred by finding that McNeil was not entitled to a prescriptive drainage easement based on characteristics of the six-inch PVC pipe that runs beneath the private road.  It was undisputed that McNeil's runoff did not flow through the six-inch PVC pipe.

22

of fact and conclusions of law. Oliver did not conclude that Mayton, McNeil, and Maranto had failed to raise prescriptive-easement claims. Instead, she suggested that the chancellor find that they had failed to satisfy their burden of proof. Similarly, the chancellor held that they failed to present clear and convincing evidence that their drainage was open, notorious, and visible, and it had not been continuous and uninterrupted for at least ten years. Consequently, the chancellor did not address the remaining elements. So although the appellants did not raise prescriptive-easement claims in their complaint, that theory was tried by consent. *See* M.R.C.P. 15(b); *Swenson v. Brouillette*, 163 So. 3d 957, 963-64 (¶¶20-22) (Miss. Ct. App. 2014).

¶51.    "The burden of proof needed to establish a prescriptive easement is the same as for a claim of adverse possession of land." *Swenson*, 163 So. 3d at 964 (¶24) (quoting *Evanna Plantation Inc. v. Thomas*, 999 So. 2d 442, 447 (¶17) (Miss. Ct. App. 2009)). "To acquire a prescriptive easement[,] the claimant must show [clear and convincing evidence] that the possession was: (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for ten years." *Id*. "Clear and convincing evidence is . . . so . . . direct and weighty . . . as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case." *Moran v. Fairley*, 919 So. 2d 969, 975 (¶24) (Miss. Ct. App. 2005).

¶52.    After inspecting the properties and hearing the evidence, the chancellor found that Mayton, McNeil, and Maranto failed to adequately prove that their use was open, notorious, and visible because "the [PVC] pipe is not visible nor is the direction in which it drains

23

water." The chancellor also held that "no one seem[ed] to know who installed the [six-]inch PVC pipe . . . or when it was installed." Thus, she concluded that it had not been in continuous and uninterrupted use for ten years.

¶53. I would find that under the precise circumstances of this case, the chancellor was manifestly wrong in concluding that Mayton and Maranto's use of the six-inch PVC pipe was not open, notorious, and visible, and that it had not been in continuous and uninterrupted use for at least ten years. It was uncontested that a metal pipe was under the private road in 1981,[8] it was approximately six inches in diameter, and it drained what eventually became Maranto's lot onto Oliver's. It was also uncontested that Tom Cameron had the metal pipe replaced with the six-inch PVC pipe in December 2007, both being under the private road to Oliver's home. The six-inch PVC pipe is in the same location as the previous metal version, slightly north of the small cul-de-sac that leads to Oliver's driveway. There was no testimony that it was impossible to see the six-inch PVC pipe. Oliver certainly knew that she had not installed it, and it was replaced approximately twenty years after she moved into the subdivision. The expert witnesses for both sides were able to observe it, and the parties had no difficulty describing it. A picture of the end that terminated onto Oliver's property is included in plaintiffs' exhibit twenty-two. It could not have channeled water if it was not open and exposed on both ends. Oliver testified that water plainly flowed through it onto her

---

[8] McNeil testified that the original metal pipe under the private road "was originally placed there by [D.W. Rochow] when he built the subdivision and when . . . Leroy Davenport . . . built his house, he [put] the PVC pipe that's in question across the road there[,] and it's remained functional until it rusted. At that point, Mr. Cameron was living in that house and he had the city replace it."

property. And Mayton testified that Oliver had called authorities when he had the six-inch PVC pipe flushed with water. McNeil testified that "occasionally, it takes a little manpower to shovel the debris" away from the six-inch PVC pipe. There was also testimony that the city had previously flushed the six-inch PVC pipe and the metal version that preceded it. The Pennsylvania Commonwealth Court has held that such maintenance activities – "periodically cleaning . . . pipes . . . every couple of years" – were sufficient to satisfy the "open, notorious, and visible" element in the context of a claim for a prescriptive drainage easement. *Gehres v. Falls Twp.*, 948 A.2d 249, 254 (Pa. Commw. Ct. 2008).

¶54. The chancellor did not analyze the remaining elements necessary to obtain a prescriptive easement. In *Delancey v. Mallette*, 912 So. 2d 483, 488 (¶15) (Miss. Ct. App. 2005), a chancellor had found that a claimant failed to present sufficient evidence of the "under a claim of ownership" element. On appeal, this Court concluded that the chancellor applied the incorrect legal standard. *Id*. at (¶16). Although the *Delancey* Court commented on some of the remaining elements, it did not proceed to act as a fact-finder and analyze all of the prescriptive-easement elements for the first time on appeal. *Id*. at 488-89 (¶¶16-18). Instead, the Court remanded the case to the chancellor for a determination whether the plaintiff had "proven all [of] the elements necessary to establish a claim for a prescriptive easement." *Id*. at 489 (¶19). Thus, I would remand the case to the chancellor for further consideration of the remaining elements. Accordingly, I respectfully dissent in part.

**LEE, CJ., IRVING, P.J., AND BARNES, J., JOIN THIS OPINION.**