# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-01638-COA

**TREMAYNE DIXON AND TYREASE DIXON**  **APPELLANTS/ CROSS-APPELLEES**

v.

**TIMBER RIDGE, LLC**  **APPELLEE/ CROSS-APPELLANT**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/09/2018 |
| TRIAL JUDGE: | HON. MITCHELL M. LUNDY JR. |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | PATRICK VANCE DALY |
| | BRETT CLANTON PICKLE |
| ATTORNEY FOR APPELLEE: | WILLIAM P. MYERS |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | AFFIRMED - 06/25/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**J. WILSON, P.J., FOR THE COURT:**

¶1.    Tremayne and Tyrease Dixon entered into a contract with Timber Ridge LLC to buy a house in Olive Branch.  When the parties signed their contract, the "spec home" was still under construction.  Subsequently, there were misunderstandings about the level of design input that the Dixons would have in the final phases of construction.  Due to these misunderstandings, Timber Ridge offered to refund the Dixons' earnest money and cancel the contract, but the Dixons declined and said that they still wanted to buy the house.  The week of the closing date, the parties exchanged emails about the status of the house, the home inspection, and the Dixons' demands that Timber Ridge address various issues with

the house.  Timber Ridge did not address the Dixons' demands to the Dixons' satisfaction.  On the closing date, Timber Ridge was ready and willing to transfer title, but the Dixons did not appear.  The Dixons claim that delays and other breaches by Timber Ridge prevented the closing.  Timber Ridge declined to reschedule the closing to sell the house to the Dixons, and the Dixons filed suit in chancery court.

¶2.    After a two-day trial, the chancellor found that the Dixons breached the contract by failing to appear at closing and that both parties repudiated the contract at different points prior to closing.  The chancellor denied the Dixons' claim for specific performance and denied the parties' respective claims for damages and attorney's fees.  The chancellor found that "the most equitable thing[] to do" would be to cancel the contract and refund the Dixons' earnest money.  Both parties appealed.  We affirm the judgment of the chancery court.

## FACTS AND PROCEDURAL HISTORY

¶3.    Tremayne and Tyrease Dixon were planning to move from Illinois to Mississippi, and they looked at houses in the Miller Farms subdivision in Olive Branch.  On August 17, 2016, the Dixons, through their realtor, Brenda McRae, made an offer on a house in the subdivision.  The house was still under construction when the Dixons made their offer.  The owner/builder, Timber Ridge, made a counteroffer through its realtor, Shelly Bookwalter.  After the counteroffer, the Dixons, McRae, and Bookwalter exchanged a series of text messages.  In those messages, the Dixons stated that they wanted the floors upgraded to hardwood throughout the first level of the house.  Later, the Dixons stated that they wanted "hardwood upgraded only on 1st level."  Bookwalter responded, "Ok that is no prob."

2

¶4. On August 20, the Dixons signed Timber Ridge's counteroffer to sell the house for $299,870, with a closing date of September 29, 2016. The contract required the Dixons to deposit earnest money of $2,500 and provided that time was of the essence. The contract also specified that it could not be changed without the parties' written, mutual consent.

¶5. Although the Dixons requested hardwood floors via text message and Bookwalter seemingly agreed to their request in a responsive text, the contract itself was not amended to provide for hardwood floors throughout the first floor of the house. The Dixons' original offer provided only that hardwood floors would be "installed in the second bedroom down." No other provisions regarding hardwood floors were added to the contract.

¶6. The parties also signed a Home Inspection Addendum. The addendum provided that the Dixons were to arrange for a home inspection within ten days "after completion" of the house. The Dixons had the right to enter the house at reasonable hours with twenty-four hours' prior notice. After the inspection, the Dixons could provide Timber Ridge a written list of any deficiencies, and Timber Ridge then had three days to consent in writing to correct deficiencies "in an amount not to exceed $1,000." If the Dixons identified deficiencies that exceeded the $1,000 limit, Timber Ridge could correct the deficiencies above the limit and proceed to closing. If Timber Ridge declined to correct deficiencies in excess of the $1,000 limit, then the Dixons could either "accept" those deficiencies and proceed to closing or "cancel the contract" and receive a refund of their earnest money.

¶7. Because the subject house was still under construction when the Dixons contracted to buy it, they toured a completed house in the same subdivision that had the same style and

3

layout to get an idea of what their house would look like when finished. They also reviewed the multiple listing service (MLS) listing for the subject house, which advertised "tile medallions in entrance and bath" and "2 shower heads." The listing included a disclaimer that the information provided was "deemed to be reliable, but [was] not guaranteed."

¶8. On August 29, 2016, the Dixons visited the house again while it was still under construction. Afterward, they emailed Bookwalter with a number of design complaints and concerns, including paint colors, the color of the shutters, standing water on an adjacent lot near the property line, the absence of a "medallion" in the master bathroom, and the lack of two shower heads mentioned in the MLS listing. They also asked about extending the front and back patio areas, keyless entry pads for the garage, and slow-closing toilet lids.

¶9. Bookwalter responded on August 31 and explained that many of the house's features were the same as the finished house that the Dixons toured prior to signing the contract. She said that there would be a tile medallion in the foyer but not in the master bathroom. She explained that "[a] double shower head will be installed [in the master bathroom] and was just covered up behind the wall per the plumber. . . . You will get [double] shower head per the MLS listing because it is already partially in place." She gave estimates for some of the additional changes requested by the Dixons.

¶10. Bookwalter sent another email on September 1, apparently in response to another email from the Dixons. She again explained that the home was a "spec home," meaning that it was not custom-designed or custom-built, and that any changes to design should have been proposed prior to signing the contract. She also noted that the MLS listing was not a contract

4

and specified that information contained on the listing was not guaranteed. Bookwalter again explained that there would be no medallion in the master bathroom due to cost, even though the MLS listing had the bathroom medallion as a feature. She also again confirmed that the double shower head would be installed.

¶11.   On September 6, the Dixons again emailed Bookwalter with a list of concerns, including questions about a "burn pile" in the backyard, landscaping requests, lighting options, and a specific brand of dishwasher. Bookwalter responded to McRae, the Dixons' realtor. Bookwalter said that given the Dixons' numerous concerns and questions, Timber Ridge did not feel that they could make the Dixons happy. Timber Ridge offered to refund the earnest money and cancel the contract.

¶12.   Bookwalter sent another email on September 7 that stated that the home would not be finished on time due to "the constant request for changes" by the Dixons. She stated that the Dixons' requests to change the cabinet layout had delayed granite countertop installation, electrical wiring, and painting. She said that there were similar issues related to the floor and the yard. Because of those delays, Timber Ridge offered to release the earnest money and cancel the contract. Bookwalter also said that the house would not be complete by the contract's September 29 closing date. Attached to the email was a disbursement and release form for the earnest money and cancellation of the contract.

¶13.   The Dixons did not sign the release. They emailed Bookwalter on September 8 and stated that they still wanted to buy the house. The Dixons apologized if they had offended anyone with their many questions. They stated that they had misunderstood the level of input

5

they would have in a spec home. They stated that they had secured financing, a home inspection, and insurance in order to close on September 29, and they asked Timber Ridge to consider extending the closing date to allow time for the house to be completed.

¶14. Bookwalter emailed McRae on September 9 and reiterated that Timber Ridge did not want to go forward with the contract because "they strongly feel that they will not be able to make the Dixon's [sic] happy in the end . . . due to previous dealings and emails." Bookwalter reiterated that Timber Ridge would not extend the closing date but would agree to cancel the contract and refund the Dixons' earnest money.

¶15. Tremayne Dixon testified that after the September 9 email, he and his wife continued to take steps necessary to close on the house. On September 15, the Dixons emailed McRae to ask her to find out when the house would be ready for inspection. On September 19, the Dixons emailed Bookwalter that the home inspection was scheduled for September 26 and that the closing would need to be pushed back due to the inspection date.

¶16. On September 23, Bookwalter emailed McRae a proposed addendum to the contract. The addendum asked the Dixons to acknowledge and accept tile floors in the kitchen, the color and design of the kitchen cabinets, the tile (with no medallion) in the master bathroom, and a single shower head in the master bathroom. The addendum also asked the Dixons to acknowledge that the landscaping, driveway, sidewalks, and patio were not warrantable; that Timber Ridge was not responsible for and could not address drainage issues on the adjacent lot; and that the final walk through would be their only opportunity to identify any remaining cosmetic issues. Finally, the addendum proposed to move the closing date to October 3.

6

¶17. According to the Dixons, this was the first they had heard from Timber Ridge or Bookwalter in the two weeks since Bookwalter's September 9 email stating that the house would not be finished by the closing date. This was also the first time the Dixons learned that there was only one shower head in the master bathroom and no hardwood flooring in the kitchen. The Dixons did not sign the proposed addendum to the contract.

¶18. The home inspection occurred on September 26, and the inspector produced a forty-six page report. The Dixons requested that Timber Ridge address all items noted in the report, which Tremayne Dixon described as "[n]ot just little minor stuff" but a long list of "[s]erious work[]."

¶19. In the days that followed, the Dixons, McRae, and Bookwalter exchanged emails about the house, the home inspection and final walk through, and the closing date. On September 27, McRae sent the following email to Bookwalter, copying the Dixons:

> Shelly,
>
> 1) We agreed and Shelly confirmed that wood would be exchanged for tile in the kitchen. Had we known they would put tile down against our wishes we would have used our money to upgrade to wood flooring in the kitchen rather than in the bedroom.
>
> With that being said, will they replace it with hardwood or pay for the work to be completed after the closing? We can get the quote from Andy the floor guy or they can get the quote. Please let them know the decision is theirs.
>
> 2) Shelly specifically said we would have double shower heads and now has retracted that. She was sure it was simply covered up behind the tile. That doesn't seem to be the case. So, now how will they resolve this double shower head issue??? The decision is theirs to do the work or compensate for the work to be completed after the closing.

3) Please, also ask them when will the complete list of issues from the home inspection report as well as the county inspectors report be resolved. We will not go to closing with any of the open issues as stated in the reports.

4) The dead tree and shrubs will need to be removed along with the dead sod and replaced with new. It is the sellers/builders responsibility to care for the property (including the lawn) while it is in their possession. Please ask them when will this work be completed.

5) We noticed there was no backsplash at all on the walls. Please ask, when will the granite be cut properly to be flushed with the counter bar and when will the backsplash be completed.

Again, we would like to extend an open date to them as to when these items can be completed so a reasonable contract extension can be made.

With that date we can schedule our initial cosmetic walk through, our final walk through and then close on this home.

We need an answer ASAP but no later than 8 am in the morning.

¶20.    Bookwalter responded by email the next day. She stated that the hardwood floors and double shower heads were not in the parties' contract, so Timber Ridge would not install or pay for them. As to the items listed in the home inspection report, she stated that Timber Ridge would repair non-cosmetic items prior to closing or "forfeit[]" the "$1,000.00 cap" provided for in the home inspection addendum to the parties' contract. She also stated that shrubbery had been replaced, that the sod was dormant and would come back with proper water and fertilizing, and that the backsplash had been installed. Finally, she stated that the burn pile would be addressed as soon as the county lifted a burn ban that was then in effect due to a lack of rain. Bookwalter also informed McRae that the county would certify the house for occupancy prior to closing, and she asked McRae to set a time for the closing.

¶21.    The Dixons received the home appraisal report on the morning of September 29. The

8

appraisal came in above the contract price at $302,000. Tremayne Dixon forwarded the appraisal to his closing attorney and asked where they stood in the process.

¶22. At 3 p.m. on September 29, Bookwalter emailed McRae that Timber Ridge was "ready, willing and able to close by 5:00 . . . per the terms of the contract." Bookwalter stated that if the Dixons were unable to perform, the contract was null and void, and Timber Ridge would refund their earnest money. The Dixons did not appear for the closing.

¶23. On October 7, 2016, the Dixons filed a complaint against Timber Ridge in the DeSoto County Chancery Court. The Dixons asserted claims of breach of contract, bad faith breach of contract, and breach of the implied covenant of good faith and fair dealing. The Dixons sought specific performance of the contract and damages. The Dixons also filed a lis pendens notice in the county land records. Timber Ridge answered and filed a counterclaim. Timber Ridge alleged that the Dixons had breached the contract, slandered title to the property, and breached the implied covenant of good faith and fair dealing. The case eventually proceeded to a two-day trial.

¶24. Tremayne testified that he did not appear at the closing because the issues identified in the home inspection had not been addressed and because he did not believe that the house was complete. Tremayne also testified that Timber Ridge never made the home available for a final walk through, and he did not even know that Timber Ridge intended to close on September 29 until Bookwalter's email at 3 p.m. that afternoon.

¶25. Tremayne admitted that he could not have closed on September 29 because his lender had not released the necessary funds. He testified that his lender required confirmation that

9

the home had been approved for occupancy, which was not received until late afternoon the day before the closing. The appraisal was not received until the day of the closing.

¶26. Robert Davis, a member of Timber Ridge LLC, testified that Bookwalter had made certain statements to the Dixons and to McRae without Timber Ridge's authorization, including her statement that a "double shower head . . . was just covered up behind the wall." Davis testified that, for space reasons, a double shower head was never in the plans. He also testified that Bookwalter's email to the Dixons on September 7 that the home would not be completed in time for the closing was untrue. Davis stated that Timber Ridge authorized Bookwalter to offer to cancel of the contract and refund the Dixons' earnest money, but only because Timber Ridge did not believe that the Dixons were going to be happy with the house. Davis denied that Timber Ridge ever agreed to install hardwood flooring throughout the first floor. Davis acknowledged that part of his reason for offering to cancel the contract was that he feared continuing complaints from the Dixons post-closing. However, when the Dixons rejected Timber Ridge's offer to cancel the contract, Timber Ridge moved "full steam ahead" to finish on time. Davis said that Timber Ridge refused to move the closing date because Timber Ridge was "ready" and the Dixons "should have been ready" too.

¶27. Don Lusure, another member of Timber Ridge LLC, testified that Timber Ridge offered to cancel the contract and refund the Dixons' earnest money because the Dixons were not happy with the house. Like Davis, Lusure testified that Timber Ridge always intended to finish the home on time, which was inconsistent with some of Bookwalter's representations to the Dixons that the house would not be complete by September 29. Lusure

10

stated that the Dixons never did their final walk through but could have done so at any time before the closing. He said the Dixons knew the house would be done by September 29 and that it was "basically" done by September 23. He testified that the home inspection and final changes typically come down "to the wire."

¶28.    Davis and Lusure both testified that the burn pile at the back of the property could not be dealt with because there was a statewide burn ban, but the debris was burned as soon as they obtained the permission of the fire marshal. Lusure testified that Timber Ridge was responsible for the burn pile and would dispose of it, even if they could not do so prior to closing.

¶29.    In November 2017, the chancellor entered an opinion and final judgment. The chancellor found that there were numerous emails, text messages, and other discussions among the Dixons, McRae, and Bookwalter before and after the contract was signed. Some of those discussions had to do with "modification of the house during construction." However, the chancellor found those discussions to be inconsistent with the contract's specific statement that it could not "be modified except by [the parties'] written mutual consent." The chancellor also found that offers were made to cancel the contract and refund the Dixons' earnest money, which the Dixons rejected, and that questions arose as to whether the house was completed or could be completed prior to the closing date. Finally, the chancellor found that Timber Ridge was present and ready to transfer title on the closing date, but the Dixons were absent.

¶30.    The chancellor found that the Dixons breached the contract by not appearing at the

11

closing. The chancellor opined that if the parties had communicated better, then the closing could have occurred. The chancellor was "also concerned with the conduct of Timber Ridge" and Bookwalter in particular. The chancellor found that both parties had repudiated the contract by declaring at various times that they could not or would not perform parts of the contract—although the chancellor did not specifically state which actions of the parties amounted to a repudiation.

¶31. The chancellor ultimately concluded that "the most equitable thing[] to do" would be to cancel the contract and order Timber Ridge to return the Dixons' $2,500 earnest money deposit. The chancellor so ordered and denied all other requests for relief.

¶32. The Dixons filed a notice of appeal. Timber Ridge later filed a motion to amend the judgment, which asked the court to direct the clerk to cancel both the original lis pendens filed by the Dixons and a "supplemental lis pendens" that the Dixons filed after final judgment was entered. Timber Ridge also filed a notice of appeal.[1]

¶33. The chancellor subsequently entered an amended final judgment cancelling the lis pendens and supplemental lis pendens filed by the Dixons.

**ANALYSIS**

¶34. On appeal, the Dixons argue that the chancellor erred by (1) finding that Timber Ridge only repudiated the contract and did not breach the contract; (2) finding that the Dixons breached the contract when they failed to appear at closing; (3) denying their requests for

---

[1] Timber Ridge's motion to alter or amend the judgment was filed outside of the ten-day time limit for such a motion, M.R.C.P. 59(e), but Timber Ridge's notice of appeal was timely filed within thirty days of the chancery court's judgment, M.R.A.P. 4.

specific performance, damages, and attorney's fees; and (4) cancelling their lis pendens and supplemental lis pendens. Timber Ridge argues that the judgment of the chancery court should be affirmed to the extent that it denied the Dixons' claims for relief. Timber Ridge also argues that its sale of the subject property during the pendency of this appeal renders moot the Dixons' claim for specific performance. Finally, on cross-appeal, Timber Ridge argues that the chancellor erred by denying its claims for damages and attorney's fees.

¶35.    In an appeal from a judgment entered after a bench trial, our standard of review is the same whether the case was tried in circuit court or chancery court:

> [W]hen a trial judge sits without a jury, this Court will not disturb his factual determinations where there is substantial evidence in the record to support those findings. Thus, our scope of review affords deferential treatment to the trial judge's findings. This Court ought and generally will affirm a trial court sitting without a jury on a question of fact unless, based upon substantial evidence, the court must be manifestly wrong. The word manifest, as defined in this context, means unmistakable, clear, plain, or indisputable. This Court, however, reviews questions of law de novo.

*Transocean Enter. Inc. v. Ingalls Shipbuilding Inc.*, 33 So. 3d 459, 462 (¶7) (Miss. 2010) (citations, quotation marks, and brackets omitted). We find no error in the chancellor's denial of the Dixons' claim for specific performance and the parties' respective claims for damages and attorney's fees. Therefore, the judgment of the chancery court is affirmed.

## I.    Hardwood Floors and Double Shower Heads

¶36.    The Dixons begin by arguing that Timber Ridge breached the parties' contract by failing to install (1) hardwood floors in the kitchen and throughout the first floor and (2) a double shower head in the master bathroom. However, the parties' contract did not provide for either of these items. Indeed, the Dixons' offer mentioned only hardwood floors in the

13

second downstairs bedroom, which were installed. Furthermore, the parties' contract expressly provided as follows:

> **Agreement Complete.** This Contract incorporates all prior agreements between the parties, contains the entire and final agreement of the parties and cannot be changed without their mutual written consent. Neither party shall be bound by any terms, conditions, oral statements, warranties or representations not contained herein.

The parties' contract also provided:

> **No Reliance.** Neither party shall be bound by any terms, conditions, oral statements, warranties or representations not herein contained. Seller(s) and Buyer(s) acknowledge that neither of them have relied upon any statement, representation or omission made or documentation provided by the other party or the Broker(s) or salesperson(s) and their representatives relating to this transaction including, but not limited to, . . . the terms or conditions of sale[.]

¶37. These contract provisions foreclose the Dixons' claim that Bookwalter modified or added to the parties' contract. Timber Ridge was not bound by Bookwalter's pre-contract representations, and the contract clearly provided that it could not be modified without Timber Ridge's express written consent. In short, Bookwalter could not supplement or modify the parties' contract via text message. "A real estate agent is a special agent of its principal and is vested with limited powers." *Hamilton v. Hopkins*, 834 So. 2d 695, 703 (¶24) (Miss. 2003). "[T]he agency of the broker extends only to bringing the parties together." *Stockstill v. Gammill*, 943 So. 2d 35, 44 (¶18) (Miss. 2006) (quoting *Everman v. Herndon*, 71 Miss. 823, 829, 15 So. 135, 137 (1894)). The broker "is not authorized . . . to make a contract of sale binding on [the seller]." *Id.* The chancellor did not manifestly err or commit any legal error in finding that Bookwalter could not and did not modify the parties' contract.

14

## II. Failure to Appear at Closing

¶38. The chancellor held that the Dixons breached the parties' contract by not closing. However, we conclude that the Dixons had the right under the contract not to close.

¶39. As discussed above, after the home inspection, the Dixons provided Timber Ridge with a substantial list of items to be corrected or repaired. In response, rather than make the repairs, Timber Ridge stated that it would pay the Dixons $1,000. This was consistent with the home inspection addendum to the parties' contract, which provided that Timber Ridge was not required to correct deficiencies in an amount greater than $1,000. The addendum further provided that if Timber Ridge declined to correct deficiencies in excess of the $1,000 limit, the Dixons had two options. They could either (a) accept the deficiencies and proceed to closing or (b) cancel the contract and receive a refund of their earnest money. The Dixons had already informed Timber Ridge that they would not proceed to closing without an agreement to install or pay for both hardwood floors and a double shower head—or with any other "open issues" from the home inspection report. Timber Ridge had already made clear that it did not intend to address those issues. Moreover, on the day of closing, Bookwalter emailed McRae (copying Davis and Lusure) to inform the Dixons that if they did not close, "the contract [would] be considered null and void with earnest money being returned back to the [Dixons]."

¶40. In substance, the parties simply exercised their respective rights under the contract. Timber Ridge exercised its right not to correct deficiencies in excess of the $1,000 limit.

15

Based on Timber Ridge's decision, the Dixons then had the right not to proceed to closing. In effect, they exercised that right by not closing on the house. On the day of closing, Timber Ridge specifically recognized that the Dixons would be entitled to a refund of the earnest money if they did not close on the house. In its final judgment, the chancery court properly granted the Dixons that relief, even if it did so for somewhat different reasons. *See Mayton v. Oliver*, 247 So. 3d 312, 323 (¶40) (Miss. Ct. App. 2017) ("[A]n appellate court may affirm for any reason sufficient to sustain the judgment and is not limited to the reasons given by the lower court.").

### III. Remedies

¶41. On appeal, the Dixons also argue that the chancellor erred by denying their claim for specific performance and by cancelling the lis pendens and "supplemental lis pendens" on the property. However, throughout this proceeding, the Dixons have demanded specific performance on their own terms, including hardwood floors and a double shower head, among other demands. For the reasons discussed above, the contract did not grant the Dixons a right to insist on those terms. In addition, because the Dixons have no claim or right to the property, the lis pendens notices should be cancelled. *See Jernigan v. Young*, 61 So. 3d 233, 238 (¶30) (Miss. Ct. App. 2011).

¶42. Both parties also argue that they are entitled to damages for breach of contract. However, for the reasons explained above, neither party established any breach of contract

16

for which they are entitled to recover damages.[2]

¶43.    Both parties also seek attorney's fees under their contract.  The contract provides for an award of attorney's fees for a party who prevails in an action "to ensure performance" of the contract.  Neither party established a breach of contract or obtained an order of specific performance or an award of damages for breach.  Therefore, neither party is entitled to an award of attorney's fees under the contract.

¶44.    We conclude that the chancellor properly awarded the only remedy either party was entitled to by cancelling the contract and ordering a refund of the Dixons' earnest money.

**CONCLUSION**

¶45.    The judgment of the chancery court is **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

---

[2] The Dixons also allege that Timber Ridge breached the contract by not finishing construction in a timely manner and by failing to communicate properly.  However, speedier construction and better communication would not have changed the fact that the Dixons were unwilling to close without hardwood floors throughout the first floor, a double shower head in the master bathroom, and other changes to the house—none of which they had a right to demand under the parties' contract.  Therefore, the Dixons did not suffer any recoverable damages as a result of these additional alleged breaches of the contract.