# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00857-COA

**JENNIFER S. JENKINS** APPELLANT

v.

**TONY D. JENKINS** APPELLEE

DATE OF JUDGMENT: 11/30/2017
TRIAL JUDGE: HON. JERRY G. MASON
COURT FROM WHICH APPEALED: CLARKE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT: JAMES A. WILLIAMS
ATTORNEY FOR APPELLEE: LEIGH ANN KEY
NATURE OF THE CASE: CIVIL - CUSTODY
DISPOSITION: AFFIRMED - 03/31/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE J. WILSON, P.J., TINDELL AND C. WILSON, JJ.**

**TINDELL, J., FOR THE COURT:**

¶1. The Clarke County Chancery Court granted Jennifer and Tony Jenkins an irreconcilable-differences divorce. The chancellor awarded Tony legal and physical custody of the parties' two minor children and granted Jennifer visitation. While the chancellor resolved additional contested issues between the parties, Jennifer's sole argument on appeal focuses on whether the chancellor erred by granting Tony custody of the children. Finding no error as to this issue, we affirm the chancery court's judgment.

## FACTS

¶2. Jennifer and Tony married on December 14, 2002. The couple had two minor children during their marriage: a son born in 2006 and a daughter born in 2009. In 2008,

Tony and Jennifer moved to Petal, Mississippi, where they lived in a home owned by Jennifer's mother and stepfather. Jennifer's mother and stepfather conveyed the home to Jennifer in 2009, and in 2013, they conveyed to Jennifer a vacant lot adjacent to the home.

¶3.    In early 2015, Tony lost his job. In March or April 2015, he obtained new employment with Dart Container in Quitman, Mississippi. Tony moved into his parents' home in Quitman while Jennifer, an elementary school teacher, remained in Petal with the children until the end of the school year. In June or July 2015, Jennifer and the children joined Tony in Quitman. The family continued to reside in Tony's parents' home. Jennifer obtained work for the 2015-2016 school year as an elementary teacher for the Quitman School District, and the children attended Quitman Elementary School. In September 2015, the parties stopped cohabitating as husband and wife but continued to reside together in Tony's parents' home.

¶4.    On May 25, 2016, Jennifer filed a complaint for divorce on the ground of habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. She then moved out of Tony's parents' home. Jennifer also resigned from her teaching position with the Quitman School District. In June 2016, Jennifer visited her sister, Karen Velkey, in Newport News, Virginia. During the visit, Jennifer applied for a teaching position in Virginia near her sister. Although Jennifer also applied for a teaching position with the Petal School District, she applied for no other teaching positions in Mississippi. After failing to obtain the position in Petal where the family had once lived, Jennifer obtained employment in Hampton City, Virginia, for the 2016-2017 school year. For the 2017-2018 school year,

2

Jennifer obtained a position in Newport News closer to her sister's home.

¶5. After a hearing on the parties' motions for temporary relief, the chancellor entered a memorandum opinion and order that granted Tony temporary custody of the parties' children. Tony and the children continued to reside with Tony's parents while Jennifer moved to Newport News to live with her sister, brother-in-law, and two nephews. Jennifer and Karen's brother also lived in the home's basement apartment, which had its own separate entrance.

¶6. On October 13, 2017, the parties consented to a divorce on the ground of irreconcilable differences. In his memorandum opinion entered on November 30, 2017, the chancellor discussed the issue of child custody and conducted an analysis of the following factors from *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983):

    (1)    age, health, and sex of the child;

    (2)    continuity of care prior to the separation;

    (3)    parenting skills and the willingness and capacity to provide primary child care;

    (4)    the employment of the parent and responsibilities of that employment;

    (5)    the physical and mental health and age of the parents;

    (6)    the emotional ties of parent and child;

    (7)    the moral fitness of the parents;

    (8)    the home, school, and community record of the child;

    (9)    the preference of the child at the age sufficient to express a preference by law;

> (10)    the stability of the home environment and employment of each parent; and
>
> (11)    other factors relevant to the parent-child relationship.

¶7.    The chancellor determined that the children's preference was inapplicable since neither child had reached the age designated sufficient by law to express a preference. The chancellor then found the following factors to be neutral: (1) the age, health, and sex of the children; (2) the parents' capacity to provide primary child care; (3) the mental health and age of the parents; (4) the parents' moral fitness; and (5) the emotional ties between the parents and children.

¶8.    The chancellor found that the following remaining factors weighed in Jennifer's favor: (1) the continuity of care prior to the separation; (2) parenting skills; and (3) the parents' employment and the responsibilities of that employment. The chancellor further determined that the following factors favored Tony: (1) the willingness to provide primary child care; (2) the physical health of the parents; (3) the children's home, school, and community records; and (4) the stability of the home environment provided by each parent.

¶9.    After conducting an *Albright* analysis, the chancellor concluded it was in the children's best interests for Tony to remain the custodial parent. The chancellor therefore awarded Tony exclusive physical and legal custody of the children and granted Jennifer reasonable visitation. By a final judgment also entered on November 30, 2017, the chancellor granted the parties an irreconcilable-differences divorce and incorporated by reference his memorandum opinion. Aggrieved by the chancellor's grant of child custody to Tony, Jennifer appeals.

## STANDARD OF REVIEW

¶10.   "The polestar consideration in any child[-]custody matter is the best interest and welfare of the child. To determine the best interest of the child, Mississippi courts are guided by the factors set forth in *Albright*." *Martin v. Martin*, 282 So. 3d 703, 708 (¶16) (Miss. Ct. App. 2019) (citation and internal quotation mark omitted). "This Court applies a limited standard of review in child-custody cases. We will reverse a chancery court's decision regarding child[-]custody determinations only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed." *Id.* at (¶15) (citations and internal quotation marks omitted). "As long as substantial evidence supports the chancellor's findings, we are without authority to disturb them, even if we would have found otherwise as an original matter." *Blevins v. Wiggins*, 284 So. 3d 808, 811 (¶10) (Miss. Ct. App. 2019). We review questions of law de novo. *Id.*

## DISCUSSION

¶11.   Jennifer contends that the chancellor's main reason for denying her custody of the children rested on the fact that she had moved to Virginia. She asserts the chancellor's ruling in this case "stands for the proposition that[,] all else [being] equal[,] a parent better stay in the vicinity of the marital home or he or she will not be a custodial parent." Jennifer asserts that the chancellor's over-emphasis on her relocation to Virginia led him to misapply the *Albright* factors and to not act in the children's best interests. Jennifer therefore asks this Court to reverse the chancellor's award of sole legal and physical custody to Tony.

¶12.   In arguing that the chancellor misapplied the *Albright* factors, Jennifer appears to take

5

issue with the chancellor's analysis of the following factors: (1) the parenting skills and the willingness and capacity to provide primary child care; (2) the home, school, and community records of the children; (3) the stability of the home environment and employment of each parent; and (4) other factors relevant to the parent-child relationship.[1]

### 1. Parenting Skills and the Willingness and Capacity to Provide Primary Child Care

¶13. With regard to this factor, the chancellor found that Jennifer had demonstrated the best parenting skills, that both parents had demonstrated a capacity to provide primary child care, but that Tony had demonstrated a greater willingness to provide primary child care. Jennifer contends the chancellor erred by not concluding that all the considerations analyzed under this factor favor her.

### a. Parenting Skills

¶14. The chancellor found that this consideration favored Jennifer due to Tony's manifestation of "an inability to control his actions when he is extremely displeased with the children or his mother." Jennifer offered into evidence six video and/or audio recordings she had secretly made of interactions that occurred while the family lived together at her in-laws' home. Jennifer testified that she recorded the videos after she and Tony had separated but before she had moved out of her in-laws' home. Jennifer contended the recordings, along with the totality of the other evidence presented, demonstrated that she should receive

---

[1] Jennifer's appellate brief contains comments that indicate her disagreement with the chancellor's findings on several other factors. But because Jennifer fails to specifically argue that the chancellor erred with regard to these factors and to provide caselaw to support any such contention, we decline to address these additional factors on appeal. *See* M.R.A.P. 28(a)(7).

primary custody of the parties' children.

¶15.    After viewing the recordings, the chancellor concluded that two of the recordings were brief and failed to "illustrate inappropriate conduct by Tony." As to a third recording in which Tony argued with his mother and daughter about whether the daughter should have apple juice, the chancellor concluded that "Tony's conduct was not inappropriate." With regard to the two remaining recordings, the chancellor found that "Tony was loud and disrespectful to his mother and his father in the presence of the children" in one and that he "was loud, profane[,] and verbally abusive" toward the children in the other.

¶16.    During his testimony, Tony acknowledged that his language and conduct in some of the recordings may have been inappropriate, and he stated that no other similar incidents had occurred since Jennifer had moved out of his parents' house. Tony further vowed that no similar conduct would occur in the future. Based on the evidence presented, the chancellor concluded that "[t]he specific events manifesting Tony's inappropriate conduct" were limited to the stressful time when "Jennifer had terminated the marital relationship" but when "she and Tony continued to live in the same bedroom in his parent[s'] home." Jennifer argues on appeal, however, that the testimony and evidence showed that "Tony acted and spoke that way at all times[.]"

¶17.    As the chancellor noted, the recordings Jennifer entered into evidence were limited to the specific time period when the parties had separated but were still living together in Tony's parents' home. While Jennifer testified that the type of behavior Tony displayed on the recordings was indicative of his behavior in general, Tony disputed this claim. "[W]hen

7

there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the credibility of the witnesses and the weight of their testimony, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Mayton v. Oliver*, 247 So. 3d 312, 322 (¶34) (Miss. Ct. App. 2017). In light of the conflicting testimony and the deference we give to a chancellor's findings on witness testimony, we cannot say that the chancellor manifestly erred in his determination of this issue.

### b. Willingness and Capacity to Provide Primary Child Care

¶18. Jennifer also disputes the chancellor's conclusion that Tony showed a greater willingness to provide primary child care.[2] In his opinion, the chancellor stated the following:

> Jennifer and Tony lived in Mississippi after they married in 2002. They lived in the Hattiesburg-Petal area until they moved to Quitman, Mississippi[,] during the summer of 2015. Jennifer had been employed at Mississippi schools since she and Tony married. She was employed as an elementary teacher during the 2015-2016 school year by the Quitman School District, and she resigned at the end of the school year. She applied for one Mississippi teacher position at Petal Elementary School[,] and she was not employed. Although she had taught school in other school districts in the immediate area, she did not apply for another job. She had accepted a teaching job with the Hampton City Schools in Virginia before this court rendered the Memorandum Opinion and Order on July 20, 2017, and she disregarded the possibility that the children could remain in Clarke County, Mississippi. Jennifer has continued to live in Virginia while the children continue to live in Clarke County, Mississippi. The distance between Jennifer's Virginia home and the children's Clarke County, Mississippi home is approximately 970 miles. Jennifer had the opportunity to live and work in Mississippi, but she preferred to move to and live in Virginia. This court finds that Jennifer and Tony have an equal capacity to provide primary care for the children, but that Tony has a greater willingness to provide primary child care than does Jennifer. The

---

[2] As noted, the chancellor found that both parties had demonstrated an equal capacity to provide primary child care.

parent who has the willingness and capacity to provide primary child care factor favors Tony as the custodial parent.

¶19. Jennifer asserts the chancellor's discussion reveals that he faulted her for moving to Virginia rather than remaining in Mississippi. She further argues the chancellor erroneously concluded her move evinced an unwillingness to provide primary child care when the evidence actually demonstrated that she "had a history of the capacity and willingness [necessary] to provide [primary] care for the children." Arguing that this factor clearly favors her, she contends that the chancellor manifestly erred in finding otherwise.

¶20. Upon review, we cannot agree with Jennifer's contention that the chancellor unduly faulted her for moving to Virginia. Although the chancellor clearly considered the fact that Jennifer had moved to Virginia rather than remaining in the area where the children had been living and attending school, we do not find from the record that the chancellor placed any unnecessary emphasis on this fact. Further, we cannot say after reviewing the record that the chancellor manifestly erred in concluding that this factor weighed in Tony's favor. Because the record contains substantial evidence to support the chancellor's determination on this factor, we find no error.

### 2. Children's Home, School, and Community Records

¶21. Jennifer also challenges the chancellor's finding that the children's home, school, and community records weighed in Tony's favor.

¶22. Relevant to the children's home record, the chancellor noted that after leaving her in-laws' home, Jennifer moved in with her sister, brother-in-law, and two nephews in Virginia. Although the parties' children visited their aunt's home in Virginia, they continued to reside

9

primarily in Quitman with their father and grandparents. In fact, as the chancellor recognized, the children had resided in their paternal grandparents' home since June or July 2015—first with their grandparents and both parents, and then with their grandparents and Tony after Jennifer moved out in May 2016. The chancellor further noted that Tony and his parents had recently been working on and adding to a nearby trailer. Tony testified that he planned to move into the trailer with the children so they could have a home of their own but remain close to his parents.

¶23. Although the homes provided by Jennifer and Tony differed in style and environment, the chancellor found both homes to be suitable. The chancellor further stated, though, that Jennifer was unsure how long she would continue to live in her sister's home while the trailer near Tony's parents' home was ready for Tony and the children to occupy. Finding that the children were more familiar with the home environment provided by Tony, the chancellor concluded that the children's home record favored Tony.

¶24. As to the children's school record, the chancellor noted that the children's grades had varied from year to year. Even so, he found that the children "have been and continue to be good students." The chancellor concluded this was the case even though the parties' son had so far attended school in three different districts and their daughter had attended school in two different districts. The chancellor stated that the effect on the children of changing schools was not known. As evidenced by the record, if Jennifer received custody, she planned to relocate the children to Virginia with her—resulting in another change in school for the children. Tony, however, planned to continue to reside in Quitman near his parents

and in the same district where the children currently attended school. Based on the evidence before him, the chancellor concluded the children's school record also favored Tony as the custodial parent.

¶25. Finally, the chancellor found that the children's community record also favored Tony. As discussed, the children resided with or near their paternal grandparents for the majority of their lives. The chancellor also acknowledged that other extended relatives on Tony's side lived in Mississippi. In addition, the evidence showed the children attended church and school in the area and participated in local extracurricular activities such as scout programs and sports. Although the children had visited their aunt's home in Virginia, the chancellor concluded their ties to their community in Mississippi were stronger. As a result, the chancellor stated that this consideration weighed in Tony's favor.

¶26. Based on a review of the record, we cannot say that the chancellor abused his discretion or manifestly erred in finding that the children's home, school, and community records all favored Tony as the custodial parent. Because substantial record evidence supports the chancellor's determination as to this factor, we find no error.

### 3. Stability of the Home Environment and Each Parent's Employment

¶27. The chancellor found that Jennifer's employment and the related responsibility of her employment favored her as the custodial parent but that the stability of the home environment provided by Tony favored him. While Jennifer disputes the chancellor's determination as to the stability of the home environment, we find that this conclusion was within the chancellor's discretion to make and was supported by substantial evidence. We therefore

11

find no manifest error.

### 4. Other Factors Relevant to the Parent-Child Relationship

¶28. Jennifer argues the chancellor should also have taken into account during his analysis the parties' respective educational levels. Jennifer asserts the evidence reflects that she is better educated than Tony and holds a more proven record of job stability. While the chancellor did not specifically address these considerations in his analysis, he clearly discussed each party's employment and related work history. In fact, the chancellor even concluded that the parties' employment and the responsibilities of their employment was a factor that favored Jennifer as the custodial parent. We therefore find this argument lacks merit.

## CONCLUSION

¶29. Upon review, we cannot say that the chancellor was manifestly wrong, was clearly erroneous, or applied an incorrect legal standard in his *Albright* analysis. Because substantial evidence supported the chancellor's findings, we affirm the chancellor's grant of sole legal and physical custody of the parties' children to Tony.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**

12